**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

|  |  |  |
|---|---|---|
| KELVIN WINN, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. 2:18-cv-02426-TLP-tmp |
| | ) | |
| RUSSELL WASHBURN, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

**ORDER UPDATING THE DOCKET, DISMISSING PETITION, DENYING
CERTIFICATE OF APPEALABILITY, CERTIFYING THAT AN APPEAL WOULD
NOT BE TAKEN IN GOOD FAITH, AND DENYING LEAVE TO PROCEED IN
FORMA PAUPERIS ON APPEAL**

Petitioner Kelvin Winn petitioned pro se under 28 U.S.C. § 2254 for a writ of habeas corpus by a person in state custody ("§ 2254 petition").[1]  (ECF No. 1.)  Respondent answered the petition, and Petitioner replied.  (ECF Nos. 16 & 18.)

Petitioner raises issues falling into three categories: (1) sufficiency of the evidence; (2) trial court error; and (3) ineffective assistance of counsel.  For the reasons discussed below, the Court **DISMISSES** the § 2254 Petition.

---

[1] Petitioner is currently confined at the Northeast Correctional Complex ("NECX") in Mountain City, Tennessee.  His Tennessee Department of Correction ("TDOC") register number is 321833.  The Court **DIRECTS** the Clerk to update the docket to reflect the current Respondent, NECX Warden Bert C. Boyd, and to terminate Russell Washburn as Respondent. The Court also **DIRECTS** the Clerk to update Petitioner's address on the docket.

## BACKGROUND

I.     **State Court Procedural History**

In July 2011, a Shelby County Criminal Court jury convicted Petitioner of "murder

during an attempt to perpetrate a robbery."  (ECF Nos. 14-3 at PageID 474; 14-9 at PageID

1383–84.)  In its opinion on the direct appeal, the Tennessee Court of Criminal Appeals

("TCCA") summarized the evidence presented at trial:

> This case arises out of the attempted robbery and shooting of the store clerk, Abdallah "Zack" Assaedi, at Sam's Food Market in Memphis on November 21, 2008, for which the defendant was charged with one count of first degree felony murder.

> **State's Proof**

> Faheid Alsidi testified that the victim was his brother, and he was notified on November 21, 2008, that his brother had been shot and killed.

> Dr. Marco Ross, a forensic pathologist with the Shelby County Medical Examiner's Office, testified that he performed the autopsy on the victim.  Dr. Ross noted that the victim suffered a gunshot wound to his left upper eyelid, with the bullet perforating the skull in the brain, which he determined to be the cause of death.

> Sergeant Andrew Brown with the Memphis Police Department testified that he was assigned to uniform patrol the day of the shooting and was dispatched to the scene.  When he and his trainee partner arrived, Sergeant Brown met with three witnesses who said that the store clerk had been shot.  He went behind the counter and felt that the victim had "a very light pulse."  He secured the scene and talked briefly with the witnesses before separating them to insure "the integrity of their information."  None of the witnesses could identify the shooter or provide any descriptive information aside from a description of the clothing the shooter was wearing.

> Myron Jones testified that he was a graduate student living in Memphis at the time of the shooting.  He went to Sam's Food Market the morning of the shooting to purchase a newspaper and some food, and two other customers were in the store at that time.  An individual wearing a Halloween mask came into the store, ran up to the front counter, and said, "It's a robbery...."  As the victim raised his hands, the gunman shot him in the head, and Jones dropped to the floor. The gunman then demanded money from Jones, and Jones gave him the two five-dollar bills in his hand.  When the gunman stepped behind the counter to go to the

cash register, Jones got up and ran out of the store to his home.  Jones talked to his pastor and then called the police and later gave a statement.  Jones identified portions of the surveillance video and still photographs taken from the footage.  On cross-examination, Jones said that he only got to look at the gunman for "a minute[ ] or two" and that his face was covered with "a Halloween mask with slits over his eyes."  In looking at one of the photographs, Jones noted that the gun was in the gunman's left hand.  However, he acknowledged that he had incorrectly stated in his statement to the police that the gun was in the gunman's right hand.

The video showed the suspect approach Sam's Food Market but stop in the alcove next to the entrance for several minutes.  The masked man then entered the store, shot the victim, took cash from Jones, tried to open the cash register, and fled the scene.  Still photographs taken from the video detailed that the man was wearing dark clothing, a mask, and white gloves and that he shot the victim with a gun held in his left hand.

Joseph Mario Williams testified that he worked at Sam's Food Market in November 2008.  On the morning of November 20, the day before the shooting, Williams and the victim were working in the store, and Williams started to exit the store to clean up the grounds outside.  As he was walking out the front door, Williams noticed "a guy with a dark sweater, or coat on, and he had the hood up, he had his hands in his pocket and his head down.... [H]e lift[ed] up his head and he had a mask on."  When the masked man saw Williams, he turned around and walked away from the store.  The mask was clear plastic, allowing Williams to discern that the man was African–American, and had a "smiley face on it."  Williams estimated that the man was 5′8″.  He called the police and reported the encounter that day.

Williams testified that, the following morning, he arrived at the store shortly after 7:00 a.m.  He was working in the deli area around 8:30 when the robbery and shooting occurred.  As he was hiding after the shooting, Williams observed that the gunman was the same man who had been at the store the previous day, noting he had on "[t]hat mask, the clothing, same clothing, hood on and that mask, that clear mask with that smiling face on it[.]"  He saw the man trying to open the cash register.  When the register would not open, the man stepped over the victim's body, picked up some money off the floor, and ran out of the store.  Williams identified portions of the store's surveillance video and still photographs taken from the footage in his testimony.

Patricia Jean testified that she lived next door to Sam's Food Market at the time of the shooting and was walking to the store around 8:30 a.m. on the day thereof.  As she passed an alcove between her house and the store, she noticed a man wearing a black hooded sweatshirt, jeans, and black shoes sitting in the alcove with his hands in his pockets.  She was only able to see the front part of the man's face because he had his hood up, but she saw that he had a "little spot," such as a birthmark or freckle, on the right side of his face.  The man asked her

for a quarter, to which she responded that she would see if she had one when she returned from the store.

Jean testified that she went in the store and saw Williams, the victim, and a man she knew as "Brother." When she came out and passed the alcove, the man again asked her for a quarter, but she told him that she did not have one. She said that the second time, the man "raised his head up a little bit more, so [she] could see a little bit better, but that's it. Everything else [wa]s the same." She returned to her house after talking to a friend, and the police arrived a couple of hours later to investigate the shooting at the store. Jean was taken to the police station, where she spoke with Sergeant James Terry Max and relayed her encounter with the man outside the store. After giving her statement, Sergeant Max gave her a ride home from the station, during which she recalled the birthmark on the man's face and told the officer that she could identify the man who asked her for money.

During the course of the investigation, officers showed Jean five different photographic arrays, on November 24, 2008, two on November 29, 2008, January 9, 2009, and January 11, 2009, each containing six pictures. Jean did not observe the individual who had asked her for money in any of the first four arrays; however, she was able to make an identification from the final array. Jean identified the defendant in court as the man she spoke with outside of Sam's Food Market the morning of the shooting.

Jean also identified portions of the store's surveillance video and still photographs taken from the footage in her testimony. She identified herself and the man who asked her for money in several stills, including one that showed the man entering the market wearing gloves within the minutes preceding the shooting.

On cross-examination, Jean admitted that the only person in the final photographic array with a mole, birthmark, or freckle on the right side of his face was the defendant and that she received a $1,000 CrimeStoppers' tip after making an identification. However, she was not apprised that she would receive money for making an identification until after she had already identified the defendant. Jean admitted that when the man outside the store asked her for a quarter, she kept walking and did not stop to talk to him, explaining that she talked to him while looking over her shoulder as she continued to walk. She estimated that she talked to him for less than a minute on her way in and out of the store.

Officer Ricky Davison with the Memphis Police Department testified that he worked as a crime scene investigator at the time of the incident and, in such capacity, photographed and processed the scene along with his partner, Officer Jones. Officer Davison identified numerous photographs of the scene, taken from various locations inside and outside the store, as well as sketches he made of the area.

Officer Darnell Gooch with the Memphis Police Department testified that he was directed to a residence by homicide investigators on January 10, 2009, to get information from the defendant so he could be contacted in the future. Officer Gooch noted that the defendant wrote down his name, birth date, and social security number using his left hand. Officer Gooch recalled that the defendant's hair was "in braids, going to the back and it was kind of short above the collar."

Sophia Lessure, a deputy court clerk and keeper of records for Shelby County General Sessions Court, testified that both the defendant and Antonio Johnson were scheduled to be in General Sessions Division 12 on February 6, 2009.

Trinika Meredith, with the Shelby County Sheriff's Office, testified as keeper of records to the dates and locations that the defendant and Antonio Johnson were housed in the Shelby County Jail. From February 6, 2009 until February 11, 2009, the two were housed on the second floor, a floor designated for inmates with medical conditions, in the same pod. The two were allowed out of their cells for six hours every day, along with other inmates of the pod level. On February 11, 2009, Johnson was moved to the fourth floor but returned to the second floor on February 13, again in the same pod as the defendant, where they both remained until March 4, 2009.

Antonio Johnson, who acknowledged a rather extensive criminal history, testified that he contacted the Memphis Police Department on February 12, 2009, to give them information concerning the defendant. He explained that he met the defendant in court on February 6, 2009, and the defendant "was just blabbing off at the mouth about what was going on." The defendant was moved into the same pod as him later that night and begun discussing the details of his case with Johnson.

Johnson testified that the defendant told him that, in November 2009, he went to a store to commit a robbery but was unable to because "he was detoured by some people." The second time, the defendant went in with his gun in hand, demanded money from the cash register, and shot the clerk in the face. The defendant said that there was a customer in the store who "fell to the ground" upon seeing the defendant, and the defendant took money from him before fleeing the store. The defendant told Johnson that he was wearing a "black hoody, some gloves, [and] some black Gucci pants" and that his hair was "in a little Afro like then, or in braids" at the time of the robbery and shooting. The defendant also indicated that he wore a mask.

Johnson testified that he contacted the homicide bureau and eventually spoke with Sergeant Max. He said that he had an occasion to talk to the defendant again, after which he wrote down a few notes, and the defendant told him that his brother dropped him off at the store prior to the incident in a four-door, white 1999 Mercury. Johnson assisted the defendant in trying to contact his

brother "to use him as an alibi." On February 12, 2009, he was shown a photographic array, from which he identified the defendant. Johnson stated that he was not prompted by the police or anyone in the prosecutor's office to obtain incriminating statements from the defendant.

On cross-examination, Johnson testified that the day after he spoke to Sergeant Max, he was moved to general population on the fourth floor of the jail. When he got a chance to the use the phone, he called Sergeant Max to see if he was able to get him moved back to the second floor because he believed that his "life was in jeopardy in that pod, because [the defendant] was affiliated with the G[angster] D[isciples]." However, he had no expectation that he could receive a favor from Sergeant Max. Johnson said that it was his idea to take notes of his second conversation with the defendant, and his getting moved back to the second floor was not a "favor for . . . taking the notes." Johnson acknowledged that he was taking several prescription drugs, including one for hallucinations, at the time of his conversations with the defendant.

Sergeant Eric Freeman with the Memphis Police Department testified that, on January 13, 2009, Sergeant Max, the lead investigator on the case, requested that he look for a white Mercury Sable. The car was parked in front of 1620 Pennsylvania Street and was owned by Linda Winn.

Sergeant James Terry Max with the Memphis Police Department testified that he responded to the scene at 10:30 a.m. on November 21, 2008, and served as the lead investigator on the case. Officers downloaded the video from the store's surveillance system. The video from the outdoor cameras showed an individual "walking . . . towards the store. The subject walked into a little alcove, a little covered area, where he was out of view. And . . . at least [ ] two customers walk[ed] by the subject and actually look[ed] at the subject." They determined who the two customers were who talked to the subject and interviewed them. One of the customers, Patricia Jean, relayed that the subject was sitting down, wearing all dark clothing and a hoody pulled over his head, and had his hands in his pockets the entire time. Jean told Sergeant Max that she saw the subject's face and thought she could identify him. Sergeant Max gave Jean a ride home from the station, and during the drive, Jean told Sergeant Max that the man had a freckle, birthmark, or mole on his face. The other customer, Dallas Jackson, said that he could not identify the individual because he did not get a good look at his face.

Sergeant Max testified that he made still shots from the surveillance video and distributed them to the "different precincts and the task force" to see if anyone had information on the "masked and gloved" subject. Various suspects were developed through CrimeStoppers' tips and information from other sources. Over the course of the investigation, Jean was shown four photographic arrays, containing suspects developed from such tips and sources. She did not recognize

the subject she saw outside of Sam's Food Market on November 21 in any of the arrays.

Sergeant Max testified that the defendant was eventually developed as a suspect after his name came up in an unrelated investigation and an officer noticed that he matched the description of the gunman at Sam's Food Market. Based upon the surveillance video showing that the gunman was left-handed, Sergeant Max sent an officer to find the defendant and have him write down his contact information in order to see which hand he wrote with. The officer observed that the defendant wrote with his left hand.

Sergeant Max testified that he created a fifth photographic array, this one containing the defendant's picture. Because the defendant had an obvious birthmark on his face, he attempted to find other individuals who had "distinctive markings on their face[s]," and those placed in the array bore some sort of discoloration or obvious anomaly in their complexion. The array was shown to Patricia Jean on January 11, 2009, and, within three seconds, she identified the defendant as the man she spoke with outside Sam's Food Market the morning of the shooting.

Sergeant Max testified that, when the defendant was arrested and questioned, he denied any involvement in the robbery and shooting. The defendant claimed that he was in Tunica, Mississippi, around Thanksgiving 2008, as he and his brother had gone there to visit their cousin, Yolanda Winn. The defendant was not sure of the exact date he went to Tunica but recalled that he returned to Memphis on Thanksgiving Day. The defendant told Sergeant Max that his mother and girlfriend could verify that he went to Tunica. However, Sergeant Max was unable to verify the alibi, as those he questioned were "[v]ery vague, very vague, no dates . . . . No[ ] one could get [him] the exact date and time frame." The defendant later requested to speak with Sergeant Max again and, during the conversation, claimed that his brother actually committed the crime.

Sergeant Max noted that they received information that the suspect "had possibly gotten out of a white four-door, like, Pontiac Sunfire type vehicle," and it was later confirmed that the defendant's mother owned a four-door, white 1999 Mercury Sable. In addition, on February 12, 2009, Antonio Johnson, an inmate in the jail, called and provided the same information as he testified to above, which Sergeant Max determined to be credible.

### Defendant's Proof

Yolanda Winn, the defendant's cousin, testified that she picked up the defendant at a liquor store in Memphis on November 17 or 18, 2008, and took him to stay with her in Tunica for "a couple of weeks." On November 20, during that two-week period, they went back to Memphis for the defendant to get "some

7

emergency food stamps" but returned to Tunica the same day. Winn explained that the defendant does not drive because he has an eye problem. Her sister, Latonya Murrell, brought the defendant back to Memphis "[a]round the 27th."

Jerold Conley testified that he was outside Sam's Food Market on the morning of November 21, 2008, and did not recall seeing anyone other than Patricia Jean and Dallas Jackson.

Dallas Jackson testified that he was present at Sam's Food Market on the day of the shooting. He recalled speaking to someone who was sitting in the alcove outside the market, but he could not see the man's face and was therefore unable to make an identification when shown a photographic array. He was able to discern that the man "was very dark in complexion."

Linda Winn, the defendant's mother, admitted that she owned a white 1999 Mercury Sable. She said that the car was "running hot" and needed a water pump at the time of the offense; therefore, it was parked in her carport and no one was driving it.

Latoya Winn, the defendant's sister, testified that she had a baby on November 20, 2008, and that the defendant did not visit her because he was out of town.

Lakeshia Atkins testified that she saw the defendant on November 21, 2008, in Memphis when the defendant was in town to get food stamps, but she could not recall what time of day she saw him. She and the defendant's brother, Robert Sutton, went to the hospital that same day to visit Latoya Winn, and Sutton was driving his mother's white Mercury Sable, despite it "running hot."

Keith Sutton, the defendant's brother, testified that Lynette Villalpando and Patricia Jean were at his house sometime in the summer of 2009. Jean saw a picture of the defendant, and she commented that he was handsome and did not state that she had identified him "as being a killer."

Lynette Villalpando testified that she was a friend of the defendant's family and was with Patricia Jean at the defendant's mother's house sometime in 2008 or 2009. She recalled that Jean saw a photograph of the defendant and commented that he was handsome. Villalpando found Jean's comment odd "[b]ecause here you accuse a man of murder, but you can't remember his face and what he looks like."

Dr. Jeffrey Newschatz testified as an expert in eyewitness identification concerning the issues and concerns with eyewitness identifications, including the one in this case.

Following the conclusion of the proof, the jury convicted the defendant, as indicted, of first degree felony murder.

*State v. Winn*, No. W2011-02568-CCA-R3-CD, 2013 WL 1858629, at *1–7 (Tenn. Crim. App.

May 2, 2013), *perm. app. denied* (Tenn. Oct. 16, 2013).

Next the TCCA opinion on post-conviction appeal summarized the evidence presented at

the post-conviction hearing:

The Petitioner filed a petition for post-conviction relief and argued that he received ineffective assistance of counsel. At the post-conviction hearing, the Petitioner testified that trial counsel did not allow him to participate in creating his trial strategy and that trial counsel only visited him twice while he was incarcerated. The Petitioner noted that trial counsel did not communicate with him other than those two visits. The Petitioner stated that there were inconsistencies in the State's proof at trial; for example, Ms. Jean testified at the suppression hearing that the perpetrator's birthmark was on the left side of his face but stated at trial that it was on the right side. Additionally, the State's witnesses were inconsistent about whether the perpetrator was holding a gun in his right or left hand and about the perpetrator's height. The Petitioner stated that trial counsel did not point out these inconsistencies to the jury, nor did he prove the Petitioner's actual height.

The Petitioner testified that he asked trial counsel to obtain an enhanced version of the surveillance video recorded by the store that was robbed, so that the jury could better see the perpetrator. Trial counsel informed the Petitioner that he enhanced the video, but the enhanced version was not shown to the jury or admitted into evidence at trial. The Petitioner also asked trial counsel to investigate whether any blood was found on the Petitioner's clothing and whether any fingerprints were found at the scene; trial counsel did not investigate this evidence. Regarding the State's witness, Mr. Johnson, the Petitioner stated that he learned that Mr. Johnson had testified for the State in other cases. The Petitioner informed trial counsel of Mr. Johnson's prior experience as a witness for the State and asked trial counsel to speak to the prosecutor in his case. Trial counsel never told the Petitioner whether he spoke to the prosecutor about Mr. Johnson. Regarding the photographic lineup that the State showed to Ms. Jean, the Petitioner pointed out to trial counsel that his photograph was the only one where the individual had a birthmark on his face. However, the Petitioner asserted that he never looked at the photographic lineup and that trial counsel never showed the lineup to him. The Petitioner stated that, during trial, counsel would not listen to the Petitioner's suggestions, and "[i]t didn't seem like he was writing at all." The Petitioner also noted that trial counsel asked the trial court for a recess during trial to retrieve a cassette tape of a witness's testimony; however, trial counsel never retrieved the tape and never played the tape for the Petitioner.

The Petitioner asserted that if trial counsel had used the information provided by the Petitioner at trial, the jury would not have convicted him of felony murder.

On cross-examination, the Petitioner stated that, if the surveillance video had been shown in full to the jury, the video would have been exculpatory evidence proving that the Petitioner did not commit the offenses at issue. The Petitioner agreed that trial counsel retained the services of Dr. Neushaff, an expert in identification, to testify at his trial. The Petitioner stated that some individuals informed him that Mr. Johnson told them that he testified against the Petitioner to try to get out of jail. He stated that he gave trial counsel the names of the individuals who heard Mr. Johnson's statement; however, trial counsel never followed up with these individuals. The Petitioner asserted that the State made a "deal" with Mr. Johnson in exchange for his testimony against the Petitioner and that the State failed to disclose this "deal." On redirect examination, the Petitioner agreed that the store's surveillance video showed that the perpetrator had a mask covering his face. The Petitioner stated that trial counsel should have argued that, if the victim's blood was not on his clothing, then the Petitioner could not have been present during the offense.

The post-conviction court questioned the Petitioner, who agreed that trial counsel argued to the jury that the Petitioner had an alibi defense and that trial counsel called several of the Petitioner's family members to testify. The Petitioner also agreed that trial counsel cross-examined Ms. Jean about her visit to the house of one of the Petitioner's family members, where Ms. Jean saw photographs of the Petitioner but did not recognize him. The post-conviction court noted that, at the hearing on the Petitioner's motion to suppress Ms. Jean's identification, trial counsel argued that the identification should be suppressed, but the trial court denied the motion.

Regarding the Petitioner's assertion that trial counsel should have requested that his clothing be tested for blood, the post-conviction court found that testing would not have "change[d] anything to put on proof that there [wa]s no blood on his clothes[.]" The post-conviction court also found that it was unclear how the clothes would have been analyzed and whether the trial court would have approved funding for any analysis. Regarding the Petitioner's assertion that trial counsel should have obtained an enhanced version of the surveillance video, the post-conviction court found that "there was no identification that was made based on the video. The only thing that the video showed was the mask and maybe a physical description of the [perpetrator] . . . ." The post-conviction court noted that Ms. Jean's identification of the Petitioner was the "key" to the State's case and that trial counsel thoroughly cross-examined Ms. Jean regarding her identification. The post-conviction court also found that trial counsel pointed out at trial that Mr. Johnson had served as an informant and witness for the State on a previous murder case.

The post-conviction court denied relief to the Petitioner after concluding that the Petitioner had "failed to carry his burden of proof as to the ineffective assistance of trial counsel." The post-conviction court found that trial counsel "did an outstanding job of representing the [P]etitioner[ ]" and "found him to be extremely well prepared both pretrial and during trial." The post-conviction court noted that trial counsel "argued a motion to suppress the identification of the [P]etitioner in a pre-trial hearing[,]" "contested the credibility of each witness and extensively cross-examined and attacked the credibility of the state's chief identification witness[,]" and "presented a valid alibi defense." The post-conviction court also found that trial counsel put on witnesses to attack the credibility of the State's witnesses and presented an expert on identification. The Petitioner's timely appeal follows.

*Winn v. State*, No. W2016-02200-CCA-R3-PC, 2017 WL 2211423, at *57 (Tenn. Crim. App. May 19, 2017), *perm. app. denied* (Tenn. Sept. 22, 2017).

Now this Court will analyze the claims here.

## **LEGAL STANDARDS**

For starters, federal courts may issue habeas corpus relief for persons in state custody under 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). But a federal court has limited authority and may grant habeas relief to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." § 2254(a).

## I.    **Exhaustion and Procedural Default**

That said, a federal court may not grant a writ of habeas corpus on behalf of a state prisoner unless, with certain exceptions, the prisoner exhausted available state remedies. *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). Under 28 U.S.C. § 2254(b) and (c), a petitioner must present to the state courts the same claim for which he seeks redress in a federal habeas court. *Id.* That means the petitioner must "fairly present"[2] each claim to all levels of state court review,

---

[2] To exhaust each claim, "[i]t is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made."

up to the state's highest court on discretionary review. *Baldwin v. Reese*, 541 U.S. 27, 29 (2004). But a petitioner need not present to all levels of the state court if the state has explicitly disavowed state supreme court review as an available state remedy. *O'Sullivan v. Boerckel*, 526 U.S. 838, 847–48 (1999).

Tennessee has done that. Indeed, Tennessee Supreme Court Rule 39 eliminated the need to seek review in the Tennessee Supreme Court. *Adams v. Holland*, 330 F.3d 398, 402 (6th Cir. 2003). Under Rule 39, "once the Court of Criminal Appeals has denied a claim of error, 'the litigant shall be deemed to have exhausted all available state remedies.'" *Id.* (quoting Tenn. Sup. Ct. R. 39); *see also Smith v. Morgan*, 371 F. App'x 575, 579 (6th Cir. 2010).

There is also a procedural default doctrine much like the exhaustion requirement. *See Edwards v. Carpenter*, 529 U.S. 446, 452–53 (2000) (noting the interplay between the exhaustion rule and the procedural default doctrine). Say the state court decides a claim on an independent and adequate state ground (such as a procedural rule prohibiting the state court from reaching the merits of the constitutional claim), the procedural default doctrine ordinarily bars a petitioner from seeking federal habeas review. *Wainwright v. Sykes*, 433 U.S. 72, 81–82 (1977); *see Walker v. Martin*, 562 U.S. 307, 315 (2011) ("A federal habeas court will not review a claim rejected by a state court if the decision of the state court rests on a state law ground that is independent of the federal question and adequate to support the judgment.") (internal quotation marks and citation omitted)).[3] In general, a federal court "may only treat a state court order as

---

*Anderson v. Harless*, 459 U.S. 4, 6 (1982) (per curiam) (internal citation omitted). Nor is it enough to make a general appeal to a broad constitutional guarantee. *Gray v. Netherland*, 518 U.S. 152, 163 (1996).

[3] The state-law ground may be a substantive rule dispositive of the case, or a procedural barrier to adjudication of the claim on the merits. *Walker*, 562 U.S. at 315. A state rule is an "adequate" procedural ground if it is "firmly established and regularly followed." *Id.* at 316 (quoting *Beard v. Kindler*, 558 U.S. 53, 60–61 (2009)). "A discretionary state procedural rule

enforcing the procedural default rule when it unambiguously relied on that rule." *Peoples v. Lafler*, 734 F.3d 503, 512 (6th Cir. 2013).

If the procedural default doctrine bars a claim at the state level, the petitioner has to show cause to excuse his failure to present the claim. *Schlup v. Delo*, 513 U.S. 298, 320–21 (1995); *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). And he must show (1) actual prejudice stemming from the constitutional violation, or (2) that a failure to review the claim will lead to a fundamental miscarriage of justice. *Schlup*, 513 U.S. at 320–21. In that sense, the petitioner must show that a constitutional error has probably led to the conviction of a person who is innocent of the crime. *Id.* at 321; *see also House v. Bell*, 547 U.S. 518, 536–39 (2006) (restating the ways to overcome procedural default and further explaining the actual innocence exception). With this in mind, the Court now looks to the legal standards for considering the merits of Petitioner's claims.

## II.   **Merits Review**

Under § 2254(d), where a state court decided a claim on the merits, a court should grant a habeas petition only if resolving the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)–(2). Petitioner carries the burden of proof on this "difficult to meet" and "highly deferential [AEDPA] standard," which "demands that state-court decisions be given the

---

. . . can serve as an adequate ground to bar federal habeas review . . . even if the appropriate exercise of discretion may permit consideration of a federal claim in some cases but not others." *Id.* (quoting *Kindler*, 558 U.S. at 60–61.) (internal quotation marks and citations omitted).

benefit of the doubt." *Cullen*, 563 U.S. at 181 (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011) and *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)).

Under § 2254(d)(1), the court has to limit its review to the record used by the state court to adjudicate the claim on the merits. *Cullen*, 563 U.S. at 181. A state court's decision is "contrary" to federal law when it "arrives at a conclusion opposite to that reached" by the Supreme Court on a question of law or "decides a case differently than" the Supreme Court has "on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). An "unreasonable application" of federal law occurs when a state court "identifies the correct governing legal principle from" the Supreme Court's decisions, "but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 412–13. So the state court's application of clearly established federal law must be "objectively unreasonable" for the writ to issue. *Id.* at 409. And the habeas court may not issue the writ just because, "in its independent judgment," it determines that the "state court decision applied clearly established federal law erroneously or incorrectly." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (citing *Williams*, 529 U.S. at 411) (internal quotation marks omitted).

There is little case law addressing whether, under § 2254(d)(2), a state court based a decision on "an unreasonable determination of the facts." In *Wood v. Allen*, the Supreme Court noted that a state-court factual determination is not "unreasonable" only because the federal habeas court would have reached a different conclusion.[4]  558 U.S. 90, 301 (2010). In *Rice v.*

---

[4] In *Wood*, the Supreme Court granted certiorari to resolve whether, to satisfy § 2254(d)(2), "a petitioner must establish only that the state-court factual determination on which the decision was based was 'unreasonable,' or whether § 2254(e)(1) additionally requires a petitioner to rebut a presumption that the determination was correct with clear and convincing evidence." *Wood*, 558 U.S. at 299. The Court found it unnecessary to reach that issue, and left it open "for another day." *Id.* at 300–01, 304 (citing *Rice v. Collins*, 546 U.S. 333, 339 (2006) (recognizing that it is unsettled whether there are some factual disputes to which § 2254(e)(1) does not apply)).

*Collins*, the Court explained that "[r]easonable minds reviewing the record might disagree" about the factual finding in question, "but on habeas review that does not suffice to supersede the trial court's . . . determination."  546 U.S. 333, 341–42 (2006).

The Sixth Circuit has described the § 2254(d)(2) standard as "demanding but not insatiable" and has emphasized that, under § 2254(e)(1), the federal court presumes that the state court's factual determination is correct absent clear and convincing evidence to the contrary. *Ayers v. Hudson*, 623 F.3d 301, 308 (6th Cir. 2010).  A federal court will not overturn a state court adjudication on factual grounds unless objectively unreasonable given the evidence presented during the state court proceeding.  *Id.*; *see also Hudson v. Lafler*, 421 F. App'x 619, 624 (6th Cir. 2011) (same).

## III.   Petitioner's Federal Habeas Claims

Petitioner's § 2254 petition and supporting memorandum raises these nine claims:

1.   The evidence was insufficient to sustain the Petitioner's conviction for felony murder committed during the perpetration of a robbery (ECF No. 1 at PageID 5; *see* ECF No. 1-1 at PageID 19, 2537);

2.   The trial court erred in denying Petitioner's motion to suppress his identification from a photographic array (ECF No. 1 at PageID 6; ECF No. 1-1 at PageID 19, 37–41);

3.   The trial court erred by allowing the testimony of the State's witness Antonio Johnson, a jailhouse informant, who elicited post-indictment statements form Petitioner allegedly confessing to the crime (ECF No. 1 at PageID 8; ECF No. 1-1 at PageID 19, 42–45);

4.   The trial court erred in allowing the State to lead witnesses over Petitioner's trial counsel's objection (ECF No. 1 at PageID 9; ECF No. 1-1 at PageID 45–48);

5.   The trial court erred in allowing introduction of duplicative photographs (ECF No. 1 at PageID 11; ECF No. 1-1 at PageID 48–51);

6. Petitioner's trial counsel was ineffective for failing to obtain an enhanced version of the surveillance video (ECF No. 1 at PageID 12; ECF No. 1-1 at PageID 51-55);

7. Petitioner's trial counsel was ineffective for failing to proffer actual evidence of the Petitioner's height to the jury (ECF No. 1 at PageID 12; ECF No. 1-1 at PageID 55–57);

8. Petitioner's trial counsel was ineffective for failing to submit the Petitioner's clothing to be tested for blood (ECF No. 1 at PageID 12; ECF No. 1-1 at PageID 57–59); and

9. Petitioner's trial counsel was ineffective for failing to investigate the State's jailhouse informant for possible impeachment evidence (ECF No. 1 at PageID 12; ECF No. 1-1 at PageID 59–62).

<u>**ANALYSIS OF PETITIONER'S CLAIMS**</u>

## I.   **Sufficiency of the Evidence**

Petitioner argues that the prosecution failed to introduce enough evidence to sustain his felony murder conviction. (ECF Nos. 1 at PageID 5; 1-1 at PageID 19, 25–37.) Petitioner asserts that the State presented only circumstantial evidence to establish Petitioner's presence near the store on the morning before and the day of the robbery and shooting. (ECF No. 1-1 at PageID 26.)

Petitioner also argues that, as a predicate for the felony murder conviction, the State tried him for attempted robbery without charging him for that offense. (*Id.* at PageID 27.) In fact Petitioner undercuts his position by noting that the State may obtain a felony murder conviction in Tennessee by proving only the *intent* to commit the underlying offense. (*Id.*) This is because the State need not charge a defendant with the offense underlying the felony murder charge. (*Id.*)

On direct appeal, the TCCA addressed the sufficiency of the evidence:

The defendant argues that the evidence is insufficient to establish his identity as the perpetrator of the felony murder in this case. In considering this

issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L.Ed.2d 560 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190–92 (Tenn.1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). The same standard applies whether the finding of guilt is predicated upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

A criminal offense may be established entirely by circumstantial evidence. *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010). It is for the jury to determine the weight to be given the circumstantial evidence and the extent to which the circumstances are consistent with the guilt of the defendant and inconsistent with his innocence. *State v. James*, 315 S.W.3d 440, 456 (Tenn. 2010). In addition, the State does not have the duty to exclude every other reasonable hypothesis except that of the defendant's guilt in order to obtain a conviction based solely on circumstantial evidence. *See State v. Dorantes*, 331 S.W.3d 370, 380–81 (Tenn. 2011) (adopting the federal standard of review for cases in which the evidence is entirely circumstantial).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *See State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing *Carroll v. State*, 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of

demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

For the purposes of this case, felony murder is defined as "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery[.]" Tenn. Code Ann. § 39-13-202(a)(2) (2010). "No culpable mental state is required . . . except the intent to commit the enumerated offenses or acts." *Id*. § 39-13-202(b). Robbery is the "intentional or knowing theft of property from the person of another by violence or putting the person in fear." *Id*. § 39-13-401(a).

The identification of a defendant as the perpetrator of a crime is a question of fact for the trier of fact to determine from the evidence presented at trial. *See State v. Strickland*, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993).

In the light most favorable to the State, the evidence is sufficient to establish the defendant's identity as the perpetrator of the offense. The day before the incident, Joseph Mario Williams, an employee of Sam's Food Market, was walking out the front door of the store when he noticed a man in dark clothing with his hood up and wearing a clear plastic mask turn around and walk away from the store. The morning of the incident, as he was hiding after the shooting, Williams observed that the gunman was the same man who had been at the store the day before, noting he had on the same clothing and same mask. Myron Jones, who was in the store at the time of the shooting, saw a man wearing a Halloween mask come into the store, announce that it was a robbery, shoot the victim, and attempt to break into the store's cash register before taking cash from Jones and fleeing. Patricia Jean, who was walking to the store the morning of the shooting, noticed a man wearing a black hooded sweatshirt, jeans, and black shoes sitting in an alcove next to the entrance with his hands in his pockets. She saw that the man had a "little spot," such as a birthmark or freckle, on the right side of his face. Jean identified the defendant in a photographic array and in court as the man she spoke with outside of Sam's Food Market the morning of the shooting. Antonio Johnson, who was housed in the jail near the defendant, was told by the defendant that he had gone into a store to commit a robbery but was unable to do so because "he was detoured by some people." The defendant told Johnson that he went into the store a second time with a gun in hand, demanded money from the cash register, and shot the clerk in the face. The defendant told Johnson that there was a customer in the store who "fell to the ground" upon seeing the defendant, and the defendant took money from him before fleeing the store. The defendant told Johnson that he was wearing black clothing, gloves, and a mask. The defendant also told Johnson that his brother dropped him off at the store prior to the incident in a four-door, white 1999 Mercury. It was verified that the defendant's mother owned a four-door, white 1999 Mercury Sable. The jury saw video and photographic evidence of the crime taking place, as well as the time leading up to the crime and the "failed attempt" the day before, in light of which it could evaluate the witnesses' testimony. We note that any questions concerning Jean's

ability to identify the defendant or the credibility of the witnesses' testimony were resolved by the jury as the trier of fact.  Based on this evidence, a rational trier of fact could have found the defendant guilty of first degree felony murder.

*State v. Winn*, 2013 WL 1858629, at *12–13.

Petitioner now argues that the TCCA's decision violates and unreasonably applies the Supreme Court's decision in *Jackson v. Virginia*.  (ECF No. 1-1 at PageID 35.)  Petitioner also asserts that the TCCA based its decision on an unreasonable determination of facts.  (*Id.*)  Petitioner first discusses the testimony from Williams, who worked at the store, and Sgt. Brown, who responded to the shooting.  (*Id.*)  Williams testified to seeing a man outside the store on the morning before the shooting and recalled details about the man's height and clothing.  (*Id.*)  Williams also testified that the man wore a clear plastic mask.  (*Id.*)  But Petitioner emphasizes that Williams never informed the police that the man had a distinctive discoloration or birthmark on his face.  (*Id.*)  Petitioner also highlights Sgt. Brown's testimony that none of the witnesses to the shooting could identify or describe the shooter aside from his clothing.  (*Id.* at PageID 36.)

Petitioner then argues that although Patricia Jean identified Petitioner as the man standing outside the store around the time of the shooting, she admitted that "the only person in the final and fifth photograph array with a mole, birthmark, or freckle on the right side of his face was the Petitioner."  (*Id.*)  Petitioner notes that Jean did not stop and talk to the man outside the store.  (*Id.*)  Instead, Jean spoke to him for less than a minute while looking over her shoulder.  (*Id.*)  Petitioner contends that it is "highly impossible" for Jean to have positively identified him as the perpetrator.  (*Id.*)

Respondent argues that Petitioner has no right to relief under the deferential standard for sufficiency of evidence.  (ECF No. 16 at PageID 3049.)  According to Respondent, the TCCA correctly identified and applied *Jackson* to analyze Petitioner's claim.  (*Id.*)  And the TCCA did

not base its decision on an unreasonable determination of the facts given the evidence presented in the state court proceedings.  (*Id.*)  Respondent asserts correctly that Petitioner's argument turns on witness credibility—the province of the jury rather than the habeas court.  (*Id.*)  Respondent contends that the jury resolved any questions about Jean's ability to identify Petitioner or the credibility of witness testimony.  (*Id.* at PageID 3050.)

Respondent points out the consistency between Williams' testimony that the man he saw outside the store turned and walked away, and Johnson's testimony that Petitioner said he "was detoured by some people."  (*Id.*)   Respondent notes that the surveillance video from the morning of the robbery shows an individual walking towards the store and stopping in a small alcove next to its entrance.  (*Id.*)  The surveillance video also showed that the shooter was wearing dark clothing, gloves, and a mask.  (*Id.*)  Jean testified that the man she saw outside the store—who she identified as Petitioner—had "a little spot" on the right side of his face and wore a black hooded sweatshirt and dark jeans.  (*Id.*)  Respondent also points to Johnson's testimony that Petitioner said he went into the store wearing a black hoodie, gloves, black pants, and a mask. (*Id.*)  Williams and Jones also testified about the shooter's mask.  (*Id.* at PageID 3051.)

Respondent also emphasizes the consistency between Johnson's testimony about Petitioner's statements, the video surveillance footage, and testimony from Jones—that the shooter demanded money from Jones, and Jones gave it to him—and from Williams—that the shooter attempted unsuccessfully to open the cash register.  (*Id.*)  According to Respondent, a rational trier of fact could convict Petitioner of felony murder during an attempted robbery on this evidence.  (*Id.*)  And so the TCCA's decision on sufficiency of evidence was not unreasonable.  (*Id.*)

Turning now to this Court's analysis.  A challenge to the sufficiency of evidence addresses whether "the government's case was so lacking that it should not have even been submitted to the jury."  *Musacchio v. United States*, 577 U.S. 237, 243 (2016) (internal quotation marks omitted).  "[A] reviewing court makes a limited inquiry tailored to ensure that a defendant receives the minimum that due process requires: a 'meaningful opportunity to defend' against the charge against him and a jury finding of guilt 'beyond a reasonable doubt.'"  *Id.* (quoting *Jackson*, 443 U.S. at 314–15).  The habeas court asks only "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson*, 443 U.S. at 319 (emphasis in original).

This standard requires a federal district court to examine the evidence in the light most favorable to the State.  *Id.* at 326 ("[A] federal habeas corpus court faced with a record of conflicting facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.").  And so a federal habeas court may not intrude on the trier of fact's role "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."  *Id.* at 319.

Sufficiency of evidence claims "face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference."  *Coleman v. Johnson*, 566 U.S. 650, 651 (2012).  First, on direct appeal, the reviewing court defers to the trier of fact, and second, on habeas review, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court."  *Id.* (internal quotation marks omitted).  The federal habeas court may overturn the state court's

rejection of such a claim only if the state court's decision was "objectively unreasonable." *Id.* (citation omitted).

On direct appeal, the TCCA first correctly identified *Jackson* as the applicable Supreme Court decision. *See State v. Winn*, 2013 WL 1858629, at \*12. Next the TCCA identified the elements of felony murder under Tennessee law. *Id.* at \*13. That court then summarized the relevant evidence supporting Petitioner's conviction. *Id.* And the TCCA emphasized Williams' observations of the shooter's clothing and mask, and that the shooter was the same man from the previous day; Jones' description of the mask, the shooter's attempts to open the cash register, and that the shooter took Jones' money before fleeing; Jean's description of the man in the alcove, the "little spot" on his face, and her identification in the photographic array; Johnson's testimony about Petitioner's admissions; and the consistency between Johnson's statement about Petitioner's involvement and the facts of the crime. *Id.*

Based on this Court's review of the trial transcripts, the TCCA correctly concluded that the State presented sufficient evidence to support Petitioner's felony murder conviction. The testimony and other evidence presented at trial permit a rational trier of fact to find Petitioner guilty of felony murder. Given the deference due the TCCA, this Court finds that the TCCA's decision did not violate or unreasonably apply *Jackson* and that the TCCA did not base its decision on an unreasonable determination of the facts given the evidence. The Court therefore **DENIES** Petitioner's sufficiency of evidence claim.

## II.     Identification from the Photographic Array

On direct appeal, Petitioner argued that the trial court erred in denying his motion to suppress Jean's identification of Petitioner from a photo array as the man she saw outside the store before the shooting. *See State v. Winn*, 2013 WL 1858629, at \*7. Petitioner now argues

22

that the TCCA's decision to uphold the denial of his motion to suppress violates the Supreme

Court's decision in *Neil v. Biggers*, 409 U.S. 188 (1972).  (ECF No. 1-1 at PageID 37.)

Petitioner asserts that due process protects a defendant from "the introduction of evidence which

results from an unreliable identification obtained through suggestive procedures."  (*Id.* (citing

*Moore v. Illinois*, 434 U.S. 220 (1977)).)

On direct appeal, the TCCA denied relief finding that photographic array was not unduly

or unnecessarily suggestive:

> The defendant argues that the trial court erred in denying his motion to suppress Patricia Jean's photographic identification of him as the man she saw outside of Sam's Food Market immediately before the robbery and shooting.  He asserts that "[d]ue to the unique appearance of the [defendant]'s birthmark, the police were compelled . . . to create photo lineups containing individuals with similar such marks on their faces, consistent with the information provided by witness Jean, in order to avoid tainting the identification process."

> On appeal, a trial court's findings of fact regarding a motion to suppress are conclusive unless the evidence preponderates against them.  *State v. Reid*, 213 S.W.3d 792, 825 (Tenn. 2006) (citing *State v. Ross*, 49 S.W.3d 833, 839 (Tenn. 2001)).  Any question about the "credibility of witnesses, the weight and value of the evidence, and a resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact."  *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996).  The party prevailing at the suppression hearing is afforded the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence."  *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998).  Thus, unless the defendant demonstrates that "the evidence preponderates against the judgment of the trial court," this court must defer to the ruling of the trial court."  *Reid*, 213 S.W.3d at 825 (citing *State v. Cribbs*, 967 S.W.2d 773, 795 (Tenn. 1998)).  However, the application of the law to the facts found by the trial court is a question of law and is reviewed *de novo*.  *See State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn.1997).

> Due process is violated if an identification procedure is: (1) unnecessarily or impermissibly suggestive and (2) gives rise to a "very substantial likelihood of irreparable misidentification."  *Simmons v. United States*, 390 U.S. 377, 384, 88 S. Ct. 967, 19 L.Ed.2d 1247 (1968).  In *Neil v. Biggers*, 409 U.S. 188, 199, 93 S. Ct. 375, 34 L.Ed.2d 401 (1972), the United States Supreme Court established a two-part test to determine when a defendant's due process rights have been violated by a pretrial identification.  Under this test, the court first considers whether the identification procedure itself was unduly or unnecessarily

suggestive. *Id*. If the identification procedure is found to have been suggestive, the court next considers "whether under the totality of the circumstances the identification was reliable even though the confrontation procedure was suggestive." *Id*. (internal quotations omitted); *see also Stovall v. Denno*, 388 U.S. 293, 302, 87 S. Ct. 1967, 18 L.Ed.2d 1199 (1967) (stating that "a claimed violation of due process of law in the conduct of a confrontation depends on the totality of the circumstances surrounding it").

The factors to be considered in evaluating the reliability of an identification obtained as part of a suggestive identification procedure include: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. *See Biggers*, 409 U.S. at 199–200. The corrupting effect of the suggestive procedure is weighed against these factors. *See Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S. Ct. 2243, 53 L.Ed.2d 140 (1977).

There is, however, no need for the court to apply the totality of the circumstances test outlined in *Biggers* if it first determines that the identification procedure itself was neither unnecessarily or impermissibly suggestive nor likely to create a substantial likelihood of irreparable misidentification. *See State v. Biggs*, 211 S.W.3d 744, 749 (Tenn. Crim. App. 2006) (citations omitted).

"Photographs contained in a photographic array do not have to mirror the accused. Instead, the law simply requires that the police refrain from 'suggestive identification procedures.'" *State v. Hall*, 976 S.W.2d 121, 153 (Tenn.1 998) (quoting *Biggers*, 409 U.S. at 196). Accordingly, "a photographic identification is admissible unless, based upon the totality of the circumstances, 'the confrontation conducted . . . was so unnecessarily suggestive and conducive to irreparable mistaken identification that [the accused] was denied due process of law.'" *Id*. (quoting *Stovall*, 388 U.S. at 301–02). The risk of irreparable mistaken identification is heightened if one of the photographs in the photographic lineup "is in some way emphasized," or if "the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime." *Simmons*, 390 U.S. at 383.

At the suppression hearing, Sergeant Max testified as to the creation of the photographic array from which Jean ultimately made an identification. He said that Jean advised that the man she saw had "a birthmark or some kind of discoloration area on his face." He maintained that all the individuals placed in the array had some type of discoloration or imperfection on their faces and that the goal in creating an array is "to make them similar and like."

After hearing the testimony and argument of the parties, the trial court denied the defendant's motion to suppress. In doing so, the trial court noted that

24

each individual depicted had some sort of unique mark or discoloration on his face.  The court did not find that any of the photographs in the array were "so grossly dissimilar from [the defendant] as to attract the attention of Ms. Jean and immediately draw her attention to [the defendant] in an unconstitutional violation of [the defendant]'s due process rights."

Upon review of the photographs in the array, we cannot conclude that the defendant's photograph was "grossly dissimilar" to the others.  *State v. Edwards*, 868 S.W.2d 682, 694 (Tenn. Crim. App. 1993) (citing *United States v. Wade*, 388 U.S. 218, 233, 87 S. Ct. 1926, 18 L.Ed.2d 1149 (1967), for the proposition that "a lineup would be considered unduly suggestive only when the other participants were grossly dissimilar").  The testimony indicates that the officers spent five hours creating an array of individuals "similar and like" to the description given by Jean.  The array includes color photographs of six African-American males, each with some type of imperfection, mark, or discoloration on his face.  In viewing the array, Jean was told that the perpetrator may or may not be depicted and was advised not to select anyone unless she was positive of the identification. Even though none of the exemplars besides the defendant has a birthmark on the right side of his face, as noted above, our supreme court has previously ruled that the "[p]hotographs contained in a photographic array do not have to mirror the accused."   *Hall*, 976 S.W.2d at 153.   In sum, we cannot conclude that the photographic identification was unnecessarily suggestive.  The defendant is not entitled to relief on this issue.

*State v. Winn,* 2013 WL 1858629, at *7–9.

Petitioner asserts that the TCCA's decision was both contrary to and an unreasonable

application of *Neil*.  (ECF No. 1-1 at PageID 40.)  Petitioner argues that the TCCA's decision is

based on an unreasonable determination of facts given Jean's testimony that: (1) she never had a

chance to view the suspect at the time of the crime because she kept walking and talked to the

man in the alcove less than a minute; (2) when exiting the store, Jean glimpsed over her shoulder

as she walked away from the suspect; (3) Jean did not tell Sgt. Max that the man had a distinctive

discoloration or birthmark until one month and nineteen days after the shooting; (4) Jean

identified Petitioner on the fifth photographic array, where only Petitioner's photograph, one of

six pictures displayed distinctive discoloration or a birthmark on the right side of the face; and

(5) Jean had adequate opportunity to gain personal knowledge about Petitioner because she saw

his pictures when visiting Petitioner's brother Keith Sutton and Jean commented that Petitioner was handsome.  (*Id.* at PageID 40–41.)

Respondent argues that the TCCA correctly identified and applied the appropriate Supreme Court precedent in *Neil* and *Simmons*.  (ECF No. 16 at PageID 3052.)  Respondent points out that because the TCCA did not find the lineup to be unnecessarily or impermissibly suggestive, it did not analyze the totality of the circumstances.  (*Id.*)  Indeed, the TCCA's found that the photographs in the array were not grossly dissimilar and that each photo contained an African American male with some type of imperfection, mark, or discoloration on his face. Respondent highlights that Petitioner's lone challenge to the lineup's suggestiveness is that none of the other individuals pictured had any type of distinctive discoloration or birthmark on the right side of the face.  (*Id*. at PageID 3053.)  But Respondent notes that Sgt. Max testified at the suppression hearing that Jean told him about the birthmark and discoloration.  (*Id.*)  And Jean also testified that she told Sgt. Max about the mark before she ever saw a lineup.  (*Id.* at PageID 3054.)  Respondent also emphasizes the steps officers took to ensure the photo array was not suggestive.  (*Id.*)

"[C]onvictions based on eye-witness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification."  *Neil*, 409 U.S. at 196–97 (1972) (quoting *Simmons v. United States*, 390 U.S. 377, 384 (1968)).  First, the court must determine whether the identification procedure is "both suggestive and unnecessary."  *See Perry v. New Hampshire*, 565 U.S. 228, 238–39 (2012) ("[D]ue process concerns arise only when law enforcement officers use an identification procedure that is both suggestive and unnecessary.").

With that standard in mind, "[a]n identification procedure is unduly suggestive if 'the procedure itself steered the witness to one suspect or another, independent of the witness's honest recollection.'" *Moody v. Harris*, No. 20-3618, 2020 WL 5498496, at *2 (6th Cir. Aug. 26, 2020), *cert. denied*, 141 S. Ct. 1255 (2021) (quoting *Wilson v. Mitchell*, 250 F.3d 388, 397 (6th Cir. 2001)). If the identification procedure is not unduly suggestive, then the analysis ends. *Parker v. Mazza*, No. 20-5609, 2020 WL 7232199, at *4 (6th Cir. Oct. 19, 2020). But even if law enforcement uses a suggestive and unnecessary identification procedure, "suppression of the resulting identification is not the inevitable consequence." *Perry*, 565 U.S. at 239 (citations omitted).

Instead, if the lineup is suggestive and unnecessary, courts employ a "totality of the circumstances" approach "to assess, on a case-by-case basis, whether improper police conduct created a 'substantial likelihood of misidentification.'" *Id.* at 239 (quoting *Neil*, 409 U.S. at 201). The "linchpin" of that analysis is the reliability of the eyewitness identification. *Id.* "Where the indicators of [a witness'] ability to make an accurate identification are outweighed by the corrupting effect of law enforcement suggestion, the identification should be suppressed." *Id*. (internal quotation marks omitted).

"Otherwise, the evidence (if admissible in all other respects) should be submitted to the jury." *Id.* The factors affecting reliability include "the opportunity of the witness to view the criminal at the time of the crime, the witness's degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation." *Id.* at 239 n.5 (quoting *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977)); *see also Sexton v. Beaudreaux*, 138 S. Ct. 2555, 2559 (2018); *Parker*, 2020 WL 7232199, at *4.

The TCCA identified and applied the appropriate Supreme Court precedent in *Neil*. *See State v. Winn*, 2013 WL 1858629, at *7–9. And the TCCA found that the fifth photo array was not unduly suggestive and concluded that it need not apply the totality of the circumstances test to assess the reliability of the identification. *See id.* at *8–9. Petitioner asserts that the TCCA based its decision on an unreasonable determination of facts. But most of the facts Petitioner asserts relate to the identification's reliability rather than any suggestiveness of the photo array. But because the TCCA did not reach that question, Petitioner's corresponding arguments are unavailing here.

Petitioner's remaining arguments similarly fail. For example, Petitioner asserts that Jean did not inform Sgt. Max about the discoloration or birthmark on the right side of the face. But Sgt. Max testified at the suppression hearing that Jean told him about the birthmark and discoloration. And Jean also testified that she told Sgt. Max about the mark before she ever saw a lineup. Lastly Petitioner argues that none of the other individuals pictured in the photo array had any type of distinctive discoloration or birthmark on the right side of their faces. But the TCCA found that "[t]he array includes color photographs of six African-American males, each with some type of imperfection, mark, or discoloration on his face . . . . Even though none of the exemplars besides the defendant has a *birthmark* on the right side of his face." *State v. Winn*, 2013 WL 1858629, at *9 (emphasis added).

This Court reviewed the photo array here and finds that it is neither unduly suggestive nor unnecessary. (*See* ECF No. 14-10 at PageID 1445.) The array contains six photographs showing the face of an African American male with discoloration or markings on their face, and photos 2, 3, and 5 have markings or discoloration on the right side of the face. (*Id.*) This Court presumes the correctness of the state court's factual findings absent clear and convincing

28

evidence to the contrary.  28 U.S.C. §§ 2254(d)(2), 2254(e)(1).  Petitioner fails to meet his

burden of presenting clear and convincing evidence to rebut that presumption.

Petitioner has not shown that the TCCA's decision violated or unreasonably applied

clearly established Supreme Court precedent or that the TCCA based its decision on an

unreasonable determination of facts given the evidence.  The Court therefore **DENIES**

Petitioner's pretrial identification claim.

### III.    Jailhouse Informant

On direct appeal, Petitioner argued that the trial court erred in failing to suppress the

testimony of State witness Antonio Johnson, a jailhouse informant who—allegedly at the request

of Sgt. Max—recounted post-indictment statements by Petitioner allegedly confessing to the

crime.  *See State v. Winn*, 2013 WL 1858629, at *9–11.  Petitioner now asserts that the TCCA's

denial of this claim violated the Supreme Court's decision in *Massiah v. United States*, 377 U.S.

201 (1964).  (ECF No. 1-1 at PageID 42.)

On direct appeal, the TCCA explained:

> The defendant argues that the trial court erred in allowing jailhouse
> informant, Antonio Johnson, to testify without limitations.  He alleges that
> Johnson was recruited by law enforcement officers to elicit statements from him
> and was thus "acting as an arm of the state for the purpose of interrogating [him]."

> A defendant's Sixth Amendment right to counsel attaches when the
> adversarial judicial process has begun.  *Montejo v. Louisiana*, 556 U.S. 778, 786,
> 129 S. Ct. 2079, 173 L.Ed.2d 955 (2009);  *Brewer v. Williams*, 430 U.S. 387, 401,
> 97 S. Ct. 1232, 51 L.Ed.2d 424 (1977); *State v. Rollins*, 188 S.W.3d 553, 565–66
> (Tenn. 2006).  "[T]he clear rule of *Massiah* [*v. United States*, 377 U.S. 201, 84 S.
> Ct. 1199, 12 L.Ed.2d 246 (1964),] is that once adversary proceedings have
> commenced against an individual, he has a right to legal representation when the
> government interrogates him."  *Brewer*, 430 U.S. at 401 (footnote omitted).  In
> Tennessee, the adversarial judicial process is initiated upon the filing of the
> formal charge, which includes the arrest warrant, indictment, presentment, or the
> preliminary hearing in cases in which a warrant was not obtained prior to the
> defendant's arrest.  *See Rollins*, 188 S.W.3d at 566; *State v. Mitchell*, 593 S.W.2d

280, 286 (Tenn. 1980); *State v. Jackson*, 889 S.W.2d 219, 222 (Tenn. Crim. App. 1993).

> Once the right to counsel has attached and been asserted, the State must of course honor it.  This means more than simply that the State cannot prevent the accused from obtaining the assistance of counsel.  The Sixth Amendment also imposes on the State an affirmative obligation to respect and preserve the accused's choice to seek this assistance.  We have on several occasions been called upon to clarify the scope of the State's obligation in this regard, and have made clear that, at the very least, the prosecutor and police have an affirmative obligation not to act in a manner that circumvents and thereby dilutes the protection afforded by the right to counsel.

*Maine v. Moulton*, 474 U.S. 159, 170–71, 106 S. Ct. 477, 88 L.Ed.2d 481 (1985) (footnote omitted).  "[K]nowing exploitation by the State of an opportunity to confront the accused without counsel being present is as much a breach of the State's obligation not to circumvent the right to the assistance of counsel as is the intentional creation of such an opportunity." *Id*. at 176.  Thus, "the Sixth Amendment is violated when the State obtains incriminating statements by knowingly circumventing the accused's right to have counsel present in a confrontation between the accused and a state agent." *Id*.  Accordingly, any statements made by the defendant to a fellow prisoner after he had been recruited by the State would be inadmissible; however, any admissions made by the defendant to a fellow prisoner before law enforcement becomes involved are admissible. *See Hartman v. State*, 896 S.W.2d 94, 100 (Tenn. 1995).

The evidence shows that the defendant told Johnson information about the shooting, and Johnson, on his own accord, took that information to Sergeant Max on February 12, 2009, and gave a statement relaying what the defendant had told him.  After giving the statement, Johnson informed Sergeant Max that he had been moved from the medical floor of the jail to the general population floor the day before and asked if Sergeant Max could get him returned to the medical floor because he felt that his life was in danger on the general population floor since the defendant was a gang member.  Sergeant Max told Johnson that he could not promise him anything but that he would make a phone call to see if he could get moved.  Sergeant Max called the chief jailer the next morning and learned later that day that Johnson had been moved back to the medical floor.  On February 16, Sergeant Max learned that Johnson had called wanting to speak to him, so Sergeant Max brought him up from the jail to talk to him a second time.  Evidently, Johnson had spoken with the defendant again and had written down notes from their conversation.  The majority of the information was the same as that relayed in Johnson's first statement, but some new details were provided.

In a hearing regarding the matter, Johnson testified that, after his first meeting with Sergeant Max, Sergeant Max did not tell him to do anything when he returned to jail. He said that Sergeant Max did not tell him to get more information from the defendant, write down notes of anything the defendant told him, or promise him anything if he got more information from the defendant. Sergeant Max testified that he did not ask Johnson to try and get more information from the defendant, explaining that he knew that if he had, Johnson would be acting as an agent of the State and the information obtained would be illegal. He said that he asked about getting Johnson moved back to the second floor only "because he had helped us out."

In ruling on the issue, the court determined that it saw nothing in the proof to indicate "that Sergeant Max planted Mr. Johnson back on the second floor with the intent and the instructions to gather more information from [the defendant]." The court was convinced from Johnson's and Sergeant Max's testimony that Johnson obtained information from the defendant "on his own, both times, without any instructions from Sergeant Max." The court observed that there was no evidence to counter Johnson's testimony that he only took notes the second time because "he wanted to write down as much as he could write down, as much as he could remember[.]" The court noted that Johnson and Sergeant Max could be crossexamined about Johnson's being moved back to the second floor, "as to judging Mr. Johnson's credibility." The court concluded:

> I don't find, based on the proof . . . that there was any violation of [the defendant]'s right to privacy. His right to not give information incriminating himself, that was violated by members of the police department, by planting an informant . . . with the intent and desire to gather improper and illegal information from [the defendant].

Upon review, we conclude that the evidence supports the trial court's determination. Both Johnson and Sergeant Max testified that Johnson spoke to the defendant the second time on his own accord and that Sergeant Max made a call to see about getting Johnson returned to the second floor of the jail as a favor for coming forward with information, not to act as an informant for the police department. There is nothing in the record to contradict this testimony to show that Sergeant Max knowingly circumvented the defendant's right to counsel. The defendant is not entitled to relief on this issue.

*State v. Winn*, 2013 WL 1858629, at *9–11.

Petitioner argues now that the TCCA's decision on direct appeal violated and

unreasonably applied *Massiah*, and that the TCCA based its decision on an unreasonable

determination of facts. (ECF No. 1-1 at PageID 44–45.) Petitioner emphasizes that the trial

court denied his motion to suppress Johnson's testimony based on the Fourth Amendment right to privacy. But the TCCA's ruling centered on whether Antonio Johnson was an agent of the State while in jail with Petitioner and whether it violated Petitioner's right to have counsel present in a confrontation with a state agent. (ECF No. 1-1 at PageID 44-45.) Petitioner argues that Sgt. Max asked about getting Johnson moved back to the second (medical) floor only because Johnson had helped the police. (*Id.* at PageID 45.) This Court now turns to its analysis of this claim looking first at the *Massiah* issue.

Under *Massiah*, a defendant is "denied the basic protections" of the Sixth Amendment "when there [is] used against him at his trial evidence of his own incriminating words, which [government] agents had deliberately elicited from him after he had been indicted and in the absence of his counsel." *Massiah*, 377 U.S. at 206. "[T]he primary concern of the *Massiah* line of decisions is secret interrogation by investigatory techniques that are the direct equivalent of police interrogation." *Kuhlmann v. Wilson*, 477 U.S. 436, 459 (1986). In *Kuhlmann*, the Supreme Court stated:

> the Sixth Amendment is not violated whenever—by luck or happenstance—the State obtains incriminating statements from the accused after the right to counsel has attached," a defendant does not make out a violation of that right simply by showing that an informant, either through prior arrangement or voluntarily, reported his incriminating statements to the police. Rather, the defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks.

*Id.* Absent "direct written or oral instructions by the State to a jailhouse informant," agency is determined by analyzing "the facts and circumstances of a particular case to determine whether there exists an express or implied agreement between the State and the informant." *See United States v. Mohammed*, 501 F. App'x 431, 445 (6th Cir. 2012).

Habeas courts have denied relief absent proof that the informant acted to elicit the confession. *See id.* at 446 (denying relief when the defendant voluntarily discussed his circumstances and "only afterwards" did the informant use this information as bargaining power); *see Post v. Bradshaw*, 621 F.3d 406, 424–25 (6th Cir. 2010) (denying relief where informant did not begin conversation and took no action to elicit the confession); *see Williams v. Chapman*, No. 19-5429, 2019 WL 5418315, at *2 (6th Cir. Aug. 6, 2019) (denying relief where "nothing indicate[d] that Detective Day must have known that Mr. Phillips was likely to obtain incriminating statements from [Williams] in the absence of counsel").

Here, the trial court noted:

> The question is not, did Sergeant Max, or anybody, do a favor for Mr. Johnson. The question is, was he placed back into that pod as an informant for the police department. And that's a totally different thing than, he helped me and I am paying him back, I'm giving him a favor.

(ECF No. 14-7 at PageID 1018.) Max testified that he did not know who Johnson was until he called with information on February 12. (*Id.* at PageID 1024.) Max said he did not know if Johnson would be moved, but stated:

> I did tell him this, if you do get moved back and you do hear something else, whatever it is, call me and let me know. I didn't tell him to go and find specific information, or I need to know about his, or that, or whatever, I didn't do that, no, sir.

(*Id.* at PageID 1022.)

Although the TCCA provided a taste of the trial court's ruling on this question, it is not the full ruling. So this Court will recount a more complete quotation from the trial court's ruling.

> For the record, it appears that Mr. Johnson was on the second floor for mental health reasons, that he was on medication on the second floor. That he was being treated for his mental issues. And that for some reason, there's nothing before me at this point, he was moved from the second floor to the fourth floor.

While he was on the second floor he contacted the police department and indicated that he had information about this homicide. In the interim he was moved to the fourth floor.

While he was on the fourth floor he went and talked to the police and gave them all the information he had. He indicated that he was afraid to be on – Mr. Johnson indicated he was afraid to be on the [fourth] floor, because of the Ganger Disciples and . . . he felt Mr. Winn was a member of the Gangster Disciples, . . . and asked Sergeant Max, after the statement, according to both Mr. Johnson and Sergeant Max, after he gave the statement to Sergeant Max, he asked could he help get him back to the second floor, because he wanted to be back on the second floor and was afraid to be on the fourth floor.

According to the supplement that was written at the time and according to Sergeant Max's testimony, he indicated he felt that he owed Mr. Johnson the obligation of at least making the phone call, although he didn't indicate that he had to do that, or that he had any authority to have him moved, but he did say that he called and said that he did him a favor, because Mr. Johnson had done a favor for --- I guess, that's the way you put it, I don't know if he did a favor for the police department. But, had come forward as a witness to a homicide and given information, unsolicited, and he felt an obligation to, at least, attempt to get him back to the second floor, as Mr. Johnson had requested. And he made a phone call, making that request.

There's nothing to indicate, I haven't heard any proof to the contrary, that he did anything other than that, just say, take him back, or if you can move him back. He was a cooperating witness, if you can move him back, move him back. And apparently, that was sufficient to get him moved back to the second floor.

Based on Mr. Johnson's testimony, he did further conversations with Mr. Winn on his own. He decided to take notes, more detailed notes on his own. There's nothing to indicate that Sergeant Max had requested this of him. The only thing is, according to Sergeant Max's testimony, you know, if you hear anything else, let me know.

You know, is that tantamount to saying, go back in and gather information? If I get you back down there, go back in and get me more information? Or is it, if you happen to hear anything else while you're in the jail, let me know.

I guess that's where you've got to look at the intent and what Sergeant Max had in mind when he made the phone call. Did Sergeant Max have in mind to try to get Mr. Johnson back on the second floor to be an informant for Sergeant Max, with regard to Mr. Winn? Or, did Mr. Johnson, on his own, decide to gather more information, either to aid his own cause, or benefit himself. I don't really know and that wasn't inquired into, whether he got any benefits from this.

I don't have anything, . . . that I am satisfied from the proof, indicated to me, that Sergeant Max planted Mr. Johnson back on the second floor with the intent and the instructions to gather more information from Mr. Winn.

After talking to Mr. Johnson and listening to his testimony and I am satisfied from his testimony that he did this on his own, both times, without any instructions from Sergeant Max. And then, I have Sergeant Max reiterating that he never told him to do anything, other than, if you get some more information let me know.

And I don't believe that this is the intent of the case law that says that an officer who places an information in a jail cell with the intent to gather information is a violation of Mr. Winn's constitutional rights. I don't have enough information here to suggest to me that Sergeant Max did that with Mr. Johnson, or intended for Mr. Johnson to act as that, in that capacity.

I don't have anything that indicates the fact that Mr. Johnson took notes the second time is anything other than Mr. Johnson's testimony that he wanted to write down as much as he could write down, as much as he could remember, so he wrote it all down.

All of those, in my opinion, are subject to cross-examination, as to what w[eight] the jury wants to give this. . . .

But, I don't find, based on the proof that I have heard, to this point, that there was any violation of Mr. Winn's right to privacy. His right to not give information incriminating himself, that was violated by members of the police department, by planting an informant in a cell, either at, near or close to Mr. Johnson or Mr. Winn, with the intent and desire to gather improper and illegal information from Mr. Winn.

I just don't find any proof of that, based on what I have heard. So to that extent, I am going to deny the motion to prevent Mr. Johnson from testifying to what else he gathered, after February the 12th, or 13th, when he was moved back to the pod.

(ECF No. 14-7 at PageID 1027–30.)

The trial court was concerned about the same issue that TCCA covered in its ruling. The difference is that no one, including the trial court and counsel, ever mentioned the Sixth Amendment. But the trial court focused on whether the use of the informant violated Petitioner's right to counsel. Mainly the trial court zeroed in on whether the informant was working for Sgt.

Max when the informant returned to jail after giving the first statement to Sgt. Max.  After meeting with the informant, Sgt. Max testified that he called the jail staff and asked them to move the informant from the fourth floor to the second.  The jail staff agreed to move the informant from the fourth to the second floor.  There he spoke with Petitioner again and took notes.  After hearing testimony from the informant and the officer, the trial court referred to courts holding that "an officer who places an information in a jail cell with the intent to gather information is [in] violation of [Petitioner's] constitutional rights.  I don't have enough information here to suggest to me that Sergeant Max did that with Mr. Johnson, or intended for Mr. Johnson to act as that, in that capacity."  (ECF No. 14-7 at PageID 1027–30.)  This ruling fits with the TCCA's decision.

The TCCA found that "t[here is nothing in the record to . . . show that Sergeant Max knowingly circumvented the defendant's right to counsel."  *State v. Winn*, 2013 WL 1858629, at *11.  The TCCA correctly identified and applied *Massiah* as the appropriate Supreme Court precedent.  *State v. Winn*, 2013 WL 1858629, at *9–10.  And even though the trial court never said "Sixth Amendment" in its ruling, it ruled consistent with the TCCA.  Andthe TCCA found no evidence of a violation of Petitioner's Sixth Amendment right to counsel.

What is more, the TCCA found that Sgt. Max's call to get Johnson moved was a favor, not for placing Johnson on the second floor as an informant to elicit testimony from Petitioner.  *See Winn*, 2013 WL 1858629, at *10.  As stated above, the Court presumes the correctness of the state court's factual findings absent clear and convincing evidence to the contrary.  28 U.S.C. §§ 2254(d)(2), 2254(e)(1).  Petitioner has not met his burden of presenting clear and convincing evidence to rebut that presumption.

Petitioner has not proved that the TCCA's decision violated or unreasonably applied *Massiah* or that the TCCA based its decision on an unreasonable determination of facts given the evidence.  The Court therefore **DENIES** Petitioner's Sixth Amendment claim related to Johnson's testimony.

## IV.     Prosecutor Leading State's Witnesses

Petitioner argues that the trial court erred in allowing the State to lead witnesses over his trial counsel's objections.  (ECF No. 1-1 at PageID 45.)  On direct appeal, Petitioner presented this issue based on the Tennessee Rules of Evidence.  (*See* ECF No. 14-13 at PageID 1583.)  Petitioner now argues that the TCCA's decision denying relief violated the Supreme Court's decision in *Pointer v. Texas*, 380 U.S. 400, 405 (1965).  (ECF No. 1-1 at PageID 45.)

On direct appeal, the TCCA addressed the alleged trial court error:

> The defendant argues that the trial court erred in allowing the State to lead witnesses over objection by defense counsel.  With no citation to the record, the defendant makes the broad claim that "[t]hroughout the course of trial, Defense Counsel objected to the State's repeated leading of witnesses during direct examination."  He asserts that "[t]his is prejudicial on its face, as it allows the [S]tate to testify and narrate the course of events in a light most favorable to its position without allowing the true character and nuance of the witness's own perceptions to reach the jury."

> We note that the defendant raised the issue concerning leading questions in his motion for new trial.  However, he did not provide a transcript of the hearing in the record on appeal for this court to review the trial court's analysis of the issue, although the record includes a written order denying the motion for new trial after a hearing.

> In any event, our review of the record shows that defense counsel made approximately twelve objections to leading over the three days of testimony.  Each of those times, except one that was overruled, the trial court sustained the objection and the State complied.  Tennessee Rule of Evidence 611(c)(1) provides that "[l]eading questions should not be used on the direct examination of a witness except as may be necessary to develop the witness's testimony."  The Advisory Commission Comments to the rule note that Rule 611(a) "recognizes the inherent power of a court to control trial conduct to prevent lawyers from abusing the process."  Under Tennessee law, the trial judge has wide discretion in

> controlling leading questions, and unless the question was not only clearly leading, but also clearly prejudicial, this court will not interfere with the action of the trial court. *Mothershed v. State*, 578 S.W.2d 96, 99 (Tenn. Crim. App. 1978). The defendant has not shown an abuse of the trial court's inherent power, nor do we find that the State's use of leading questions prejudiced the verdict in this case. *See Hale v. State*, 198 Tenn. 461, 281 S.W.2d 51, 58 (Tenn. 1955); *Mothershed*, 578 S.W.2d at 99; *State v. Bobby Gene Keck*, No. 01C01–9401–CC–00017, 1997 WL 254228, at * 13 (Tenn. Crim. App. May 16, 1997), *perm. app. denied* (Tenn. Mar. 2, 1998). The defendant is not entitled to relief on this issue.

*State v. Winn*, 2013 WL 1858629, at *11.

Petitioner argues that the TCCA's decision violates and unreasonably applies *Pointer*. (ECF No. 1-1 at PageID 45–47.) In particular, Petitioner aims at this language from the *Pointer* decision:

> In the constitutional sense, trial by jury in a criminal case necessarily implies at the very least that the evidence developed against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, or cross-examination, and of counsel.

380 U.S. at 405 (quoting *Turner v. Louisiana*, 379 U.S. 466, 472–73 (1965) (internal quotation marks omitted)). Petitioner then equates the State's use of leading questions to prosecutorial misconduct. (ECF No. 1-1 at PageID 46 (citing *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)).)

Petitioner asserts that the TCCA based its decision an unreasonable determination of facts. (*Id.* at PageID 47.) Petitioner points to the fact that his trial counsel objected twelve times to the State asking leading questions on direct examination over three days of testimony, with the trial court overruling all but one objection. (*Id.*) Petitioner argues that the State's excessive use of leading questions led to the jury hearing otherwise inadmissible testimony. (*Id.*) Petitioner contends that the State's leading questions denied him due process because the evidence against him came not from the witness stand, but from the State. (*Id*. at PageID 47–48.)

Respondent counters that the procedural default doctrine bars this claim and that the

TCCA's rejection of this claim was not unreasonable under § 2254(d).  (ECF No. 16 at PageID

3060.)  Respondent highlights that Petitioner did not fairly present this claim as a matter of

federal law—instead citing only Tennessee Rule of Evidence 611—to the state courts.  (*Id*. at

PageID 3060–61.)  Respondent correctly notes that general allegations of the denial of a fair trial

or due process do not present a federal constitutional claim.  *See McMeans v. Brigano*, 228 F.3d

674, 681 (6th Cir. 2000).

Petitioner argues that he fully exhausted this claim by raising it in the motion for new

trial and on direct appeal.  (ECF No. 18 at PageID 3084.)  But because Petitioner did not present

this claim as a constitutional violation in the state court proceeding, he did not fairly present it as

a constitutional violation. And so it is not fully exhausted.  Petitioner has not argued cause and

prejudice or a miscarriage of justice to overcome the procedural default.

On the merits of Petitioner's claim, Respondent argues that Petitioner cannot show that

the trial court's evidentiary rulings denied him due process.  (ECF No. 16 at PageID 3061.)

Respondent notes that Petitioner has identified no specific objection that the trial court

improperly overruled and has not shown an error rising to the level of a due process violation.

(*Id.* at PageID 3062.)  Indeed, Petitioner alleges only generally that the prosecutor's excessive

leading questions violated his due process and Sixth Amendment rights.

A petitioner's conclusory allegations of prosecutorial misconduct fail to state a claim

upon which habeas relief can be granted.  *See Calwise v. Curtin*, No. 06-CV-14996, 2008 WL

2397654, at *5 (E.D. Mich. June 10, 2008), *aff'd*, 367 F. App'x 644 (6th Cir. 2010).  What is

more, Petitioner here alleges no facts specific to his claims of prosecutorial misconduct related to

the leading questions.  And so Petitioner has not proved a due process violation.  *See Ford v.*

*United States of Am.*, No. 19-5574, 2019 WL 6489017, at *2 (6th Cir. Sept. 4, 2019) (upholding a district court's rejection of prosecutorial misconduct claims because "[r]easonable jurists would not debate whether [the petitioner's] conclusory allegations . . . fail to demonstrate that his trial was 'so infected . . . with unfairness as to make the resulting conviction[s] a denial of due process.'" (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974))); *see also* Rule 2(c)(2) of the Rules Governing § 2254 Proceedings (requiring the petitioner to "state the facts supporting each ground" for relief).

As for Petitioner's remaining argument on this claim, his reliance on *Pointer* is misplaced.  The *Pointer* decision involves "the Sixth Amendment's guarantee of confrontation and cross-examination."  380 U.S. at 407.  The *Pointer* Court held that "the confrontation guarantee of the Sixth Amendment . . . is to be enforced against the States under the Fourteenth Amendment."  *Id.* at 406 (internal quotation marks omitted).  The *Pointer* decision does not address a prosecutor's use of leading questions for state witnesses at trial.  And so that decision does not apply here.

Petitioner grounds his next claim on the trial court's evidentiary rulings on defense counsel's objections to leading questions.  Claims over evidentiary rulings at trial rarely meet the standard for habeas relief.  "[F]ederal habeas courts review state court evidentiary decisions only for consistency with due process."  *Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001) (citing *Patterson v. New York*, 432 U.S. 197, 202 (1977)).  A federal court may only "grant relief in cases where 'the state's evidentiary ruling is so fundamentally unfair that it rises to the level of a due-process violation.'"  *Stewart v. Winn,* 967 F.3d 534, 540 (6th Cir. 2020) (quoting *Moreland v. Bradshaw*, 699 F.3d 908, 923 (6th Cir. 2012)).  That said, "a habeas petitioner's challenge to an 'evidentiary ruling' cannot satisfy § 2254(d)(1) unless the petitioner identifies 'a

40

Supreme Court case establishing a due process right with regard to [the] specific kind of evidence' at issue." *Id.* at 538 (quoting *Moreland*, 699 F.3d at 923); *see also Keahey v Marquis*, 978 F.3d 474, 480 (6th Cir. 2020) (same).

More to the point, the Sixth Circuit has acknowledged that using leading questions on direct examination does not violate the Sixth Amendment and falls within the sound discretion of the trial court. *See Jordan v. Hurley*, 397 F.3d 360, 363 (6th Cir. 2005); *see United States v. Shoupe*, 548 F.2d 636, 641 (6th Cir. 1977). Courts have denied habeas relief on claims of a prosecutor's use of leading questions because there is no clearly established Supreme Court precedent establishing a due process violation. *See McLean v. Rewerts*, No. 1:19-cv-799, 2021 WL 2270085, at *10–12 (W.D. Mich. May 5, 2021) (noting that petitioner has not cited Supreme Court authority for his argument); *Glenn v. Warden, Ross Corr. Inst.*, No. 1:12-CV-706, 2013 WL 6578768, at *8 (S.D. Ohio Dec. 16, 2013) ("This Court is unaware of any United States Supreme Court precedent which holds that it is unconstitutional to ask leading questions on direct examination of the prosecution's witnesses.")

Here Petitioner alleged no constitutional violation in the state courts. So procedural default bars his claim. What is more, Petitioner makes no argument to overcome that default. Petitioner pleads no specific facts to support this claim and relies only on conclusory allegations. And Petitioner has failed to identify Supreme Court precedent establishing a due process violation for evidentiary rulings on leading questions. For these reasons, the Court **DENIES** Petitioner's due process claim that the prosecutor asked leading questions of state's witnesses.

## V.     Duplicative Crime Scene Photographs

Petitioner next argues that the trial court erred in allowing the introduction of duplicative crime scene photographs. (ECF No. 1-1 at PageID 48.)

On direct appeal, the TCCA explained:

The defendant argues that the trial court erred in allowing the introduction of duplicative photographs. He does not direct his argument to any particular photographs and simply asserts that "the State was permitted to enter cumulative, prejudicial, and gruesome photographs, over the objection of Defense [C]ounsel, to an extent that far outweighed any possible probative values."

The record contains a number of objections to the State's introduction of photographs. Defense counsel objected to still frames from the surveillance video showing various witnesses in different positions and to pictures of the inside and outside of the store from different angles, asserting that "at a certain point it is getting to be cumulative photos[.]" The court heard each objection and ruled that the photographs were not cumulative and were relevant.

We note that the defendant raised the issue of duplicative photographs of the crime scene in his motion for new trial. However, he did not provide a transcript of the hearing in the record on appeal for this court to see the trial court's analysis of the issue, although the record includes a written order denying the motion for new trial after a hearing. In any event, the admissibility of photographs generally lies within the sound discretion of the trial court and will not be overturned on appeal absent a clear showing that the trial court abused its discretion. *State v. Faulkner*, 154 S.W.3d 48, 67 (Tenn. 2005); *State v. Banks*, 564 S.W.2d 947, 949 (Tenn. 1978). "Tennessee courts follow a policy of liberality in the admission of photographs in both civil and criminal cases." *State v. Morris*, 24 S.W.3d 788, 810 (Tenn. 2000). In determining whether a photograph is admissible, the trial court must first determine whether it is relevant to a matter at issue in the case. *See* Tenn. R. Evid. 401; *State v. Vann*, 976 S.W.2d 93, 102 (Tenn. 1998); *Banks*, 564 S.W.2d at 949. The court must next consider whether the probative value of the photograph is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403.

We cannot conclude that the trial court abused its discretion in allowing the photographs into evidence. Each photograph was relevant to present the layout of the scene or a witness's perception of the scene or perpetrator. "Photographs are not necessarily rendered inadmissible because they are cumulative of other evidence or because descriptive words could be used." *State v. Faulkner*, 154 S.W.3d 48, 70 (Tenn. 2005) (citing *Collins v. State*, 506 S.W.2d 179, 185 (Tenn. Crim. App. 1973)). The defendant is not entitled to relief on this issue.

*State v. Winn*, 2013 WL 1858629, at *12.

Petitioner argues that the TCCA's decision violated and unreasonably applied *Darden v. Wainwright*, 477 U.S. 168 (1986).  (ECF No. 1-1 at PageID 50.)  Petitioner also asserts that the TCCA based its decision on an unreasonable determination of the facts.  (*Id.*)  In particular, Petitioner argues that the TCCA erred because the duplicative photographs' probative value was substantially outweighed by the danger of unfair prejudice and needless presentation of cumulative evidence.  (*Id.*)  And so Petitioner states that the admission of these unduly prejudicial photographs into evidence rendered the trial fundamentally unfair.  (*Id.*)  According to Petitioner, the photographs—rather than establish him as the perpetrator or link him to the crime—depicted only the gruesome crime scene.  (*Id.*)  Petitioner contends that the State took still frames from the store's video real-time footage also introduced into evidence.  (*Id.*)  Petitioner asserts that the State introduced the photos solely to inflame the jury's passions, denying him the right to a fair trial.  (*Id.*).

Respondent argues that the claim is barred by the procedural default doctrine and without merit.  (ECF No. 15 at PageID 3063–64.)  Respondent asserts that Petitioner presented this claim in the state courts as a violation of state law based on Tennessee case law and rules of evidence, rather than a federal due process violation or prosecutorial misconduct.  (*Id.* at PageID 3063.)  Respondent emphasizes that the Tennessee cases Petitioner cited do not apply because they include no constitutional analysis.  (*Id.*)

Petitioner counters that he fully exhausted this claim by raising it in the motion for new trial and on direct appeal.  (ECF No. 18 at PageID 3084.)  But because Petitioner did not present this claim as a constitutional violation in the state court proceedings, he did not fairly present it as a constitutional violation.  And so he did not fully exhaust this claim.  Petitioner has not argued cause and prejudice or a miscarriage of justice to overcome the procedural default.

Looking to the merits of the claim, as noted above, "a violation of a state's evidentiary rule warrants habeas corpus relief only when such violation results in the denial of fundamental fairness, and concomitantly, a violation of due process." *Brown v. O'Dea*, 227 F.3d 642, 645 (6th Cir.2000). In another case, *Frazier v. Huffman*, the Sixth Circuit affirmed the denial of habeas corpus relief on a claim challenging an Ohio trial court's admission of multiple photographs of a murder victim's corpse. 343 F.3d 780, 789 (6th Cir. 2004). The trial court admitted those photographs to illustrate, in part, "the nature of the encounter that immediately preceded" the victim's death with each photograph presenting a different perspective of the victim. *Id.* at 789.

Here the TCCA cites essentially the same basis as the *Frazier* court, stating that "[e]ach photograph was relevant to present the layout of the scene or a witness's perception of the scene or perpetrator." *State v. Winn*, 2013 WL 1858629, at *12; *see also Upshaw v. Turner*, No. 05-2097-JPM/dkv, 2007 WL 1757255, at *910 (W.D. Tenn. Apr. 30, 2007) (denying habeas relief for admission of four photographs depicting the deceased victim and the interior of his car at various angles).

The Sixth Circuit has affirmed, on habeas corpus review, the admission of far more gruesome—and therefore more prejudicial—photographs of a murder victim than those here. *See Biros v. Bagley*, 422 F.3d 379, 391 (6th Cir. 2005) (concluding that state court decision affirming the admission of "three photographs-depicting [the victim's] severed head, her severed head held near her torso and severed breast, and her torso with the severed head and severed breast replaced on torso," was not an unreasonable application of Supreme Court precedent because the photographs refuted the petitioner's account of the victim's death); *see also Johnson v. Westbrooks*, No. 16-6799, 2017 WL 6398034, at *2 (6th Cir. July 21, 2017) (denying a

certificate of appealability on a due process claim that the trial court should have excluded

photographs of the murder victim's unborn child); *see also Meridy v. Ludwick*, No. 17-2006,

2018 WL 4191337, at *1 (6th Cir. May 21, 2018) (denying a certificate of appealability for

admission of autopsy photographs that were not gruesome and used to highlight the pathologist's

testimony about the victim's injuries and relevant in showing premeditation and intent to kill).

 For these reasons, the Court **DENIES** Petitioner's claim challenging the admission of

duplicative crime scene photographs.

## VI. Ineffective Assistance of Counsel

 Petitioner argues that his trial counsel gave ineffective assistance by failing to: (1) obtain

an enhanced version of the surveillance video of the gas station; (2) proffer actual evidence of

Petitioner's height to the jury; (3) submit the Petitioner's clothing to be tested for blood; and (4)

investigate the State's jailhouse informant for possible impeachment evidence. (ECF No. 1-1 at

PageID 51–52.) Respondent argues that the TCCA's rejection of Petitioner's ineffective

assistance of counsel claims is not objectively unreasonable under § 2254(d). (ECF No. 16 at

PageID 3065–67.)

 The standards stated in *Strickland v. Washington* control a claim that ineffective

assistance of counsel has deprived a defendant of his Sixth Amendment right to counsel. 466

U.S. 668, 687 (1984). To succeed on this claim, a movant must show that (1) counsel's

performance was deficient, and (2) "that the deficient performance prejudiced the defense." *Id.*

"The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so

undermined the proper functioning of the adversarial process that the trial cannot be relied on as

having produced a just result." *Id.* at 686.

Plus the Sixth Circuit noted recently that this standard is "even more difficult to meet in habeas cases, where the review that applies to *Strickland* claims is 'doubly deferential.'" *Tackett v. Trierweiler*, 956 F.3d 358, 373 (6th Cir. 2020) (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)). "The question is not whether a federal court believes the state court's determination under the *Strickland* standard was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Id.* (internal quotation marks and citation omitted).

To prove deficient performance, a person challenging a conviction "must show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. A court considering a claim of ineffective assistance applies a "strong presumption" that counsel's representation was within the "wide range of reasonable professional assistance." *Id*. at 689. A petitioner's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. at 687.

To show prejudice, a petitioner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694.[5] "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694. And "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id*. at 693. Instead, counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id*. at 687; *see also Wong v. Belmontes*, 558 U.S. 15, 27 (2009) (per curiam) (stating "*Strickland* does not require the State to 'rule out'" a more favorable outcome to prevail, but "places the burden on the defendant, not the State, to show a 'reasonable probability' that the result would have

---

[5] If a reviewing court finds a lack of prejudice, it need not determine whether, in fact, counsel's performance was deficient. *Strickland,* 466 U.S. at 697.

been different.").  When a petitioner brings a claim in federal court, his burden is even harder to meet.

A federal court's deference to a state-court decision under 28 U.S.C. § 2254(d) increases when reviewing an ineffective assistance claim.  Consider this quote from the Supreme Court's opinion in *Harrington*:

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult.  The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so.  The *Strickland* standard is a general one, so the range of reasonable applications is substantial.  Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d).  When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

562 U.S. at 105 (internal citations and quotation marks omitted).

On post-conviction appeal, the TCCA identified and applied the correct Supreme Court precedent in *Strickland*.  *Winn v. State*, 2017 WL 2211423, at *7–8.  Now the Court will address the individual areas of alleged ineffectiveness.

**A.      Enhanced Surveillance Video**

Petitioner argues that his counsel was ineffective for failing to obtain an enhanced version of the surveillance video of the gas station.  (ECF No. 1-1 at PageID 53.)  On post-conviction appeal, the TCCA opined:

> The Petitioner asserts that trial counsel's failure to obtain an enhanced version of the surveillance video and present it to the jury at trial was deficient and that he suffered prejudice as a result.  In his brief, the Petitioner argues that, on the enhanced video, the jury "would [have] be[en] able to better view the perpetrator and evaluate his height, build, and complexion."  The post-conviction court found that "there was no identification that was made based on the video.  The only thing that the video showed was the mask and maybe a physical description of the [perpetrator.]"

We conclude that the Petitioner has failed to establish that he was prejudiced by trial counsel's failure to obtain an enhanced version of the surveillance video. The record supports the post-conviction court's finding that the surveillance video was not a salient part of the State's argument that the Petitioner was the perpetrator of the felony murder. Because the video showed that the perpetrator was wearing dark clothing, a mask, and gloves, *Kelvin Winn*, 2013 WL 1858629, at *2, it is unlikely that enhancing the video would have enabled the jury to better evaluate the perpetrator's appearance. Additionally, as the post-conviction court noted, the State's strongest evidence of the Petitioner's identity was Ms. Jean's identification on the photographic lineup. Further, the Petitioner did not introduce an enhanced version of the surveillance video into evidence at the post-conviction hearing. *See Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). The Petitioner has failed to establish how showing an enhanced version of the video at trial would have altered the jury's verdict. Because the Petitioner has failed to establish prejudice, we will not address whether trial counsel's performance in this aspect was deficient. *See Finch*, 226 S.W.3d at 316. The Petitioner is not entitled to relief on this ground.

*Winn v. State*, 2017 WL 2211423, at *8.

Petitioner argues that the TCCA's decision violated and unreasonably applied *Strickland*. (ECF No. 1-1 at PageID 54.) He also contends that the TCCA based its decision on an unreasonable determination of facts, because Petitioner's trial counsel did not testify at the post-conviction evidentiary hearing. (*Id.*) Petitioner asserts that the TCCA acknowledged that the video showed the mask and physical appearance of the perpetrator. (*Id.*) But petitioner argues that had a video production specialist enhanced the video, the footage would have showed different viewpoints of the perpetrator and allowed for easier identification. (*Id.*) In effect, Petitioner argues that an expert in physical appearance identification would have been able to determine whether Petitioner was the perpetrator depicted in the enhanced video footage based on the individual's height, weight, build, movement, and facial characteristics. (*Id.*) Petitioner contends that, but for his counsel's deficient performance, there is a reasonable probability that he would have been acquitted by the jury of first-degree felony murder. (*Id.*)

48

In contrast, Respondent asserts that the TCCA correctly identified and applied *Strickland*, and that the decision is a "run-of-the-mill" state court decision applying the correct legal rule from Supreme Court cases.  (ECF No. 16 at PageID 3067.)  Respondent emphasizes that the TCCA noted that the surveillance video was not a prominent part of the State's argument, that an enhanced video would not have allowed the jury to better evaluate the perpetrator's appearance, and that Jean's identification was the strongest evidence that Petitioner was the perpetrator.  (*Id.*)  Respondent adds that Petitioner never provided an enhanced version of the video, and thus has not established prejudice.  (*Id.*)

What is more, Respondent argues that the record fully supports the TCCA's conclusion and that courts have repeatedly concluded that a state court's rejection of an ineffective assistance claim where the petitioner has failed to produce the evidence in question is not unreasonable.  (ECF No. 16 at PageID 3068.)  Respondent asserts that Petitioner's argument about an expert's ability to determine whether Petitioner was the person in the video is purely speculative.  (*Id.*)  This Court agrees with Respondent.  The cases support this position.

For instance, in *O'Neal v. Burt,* the Sixth Circuit denied habeas relief where the Petitioner failed to "reveal what *admissible* evidence, if any, trial counsel might have discovered."  582 F. Appx. 566, 574 (6th Cir. 2014) (emphasis in original).  The court—conducting its own *Strickland* analysis—stated:

> Rather than producing admissible evidence that might undermine confidence in the outcome of the case, O'Neal instead asked the court to speculate that the outcome might have been different if only trial counsel had investigated the hearsay information contained in the Report.
>
> Speculation, however, is not enough to satisfy a defendant's burden to prove prejudice.  *See Baze v. Parker*, 371 F.3d 310, 322 (6th Cir. 2004) (noting that where "on "one is left with pure speculation on whether the outcome of the trial ... could have been any different," there is an insufficient showing of prejudice); *Villafuerte v. Stewart*, 111 F.3d 616, 632 (9th Cir.1997) (denying

49

petitioner's ineffective assistance claim where he presented no evidence concerning what counsel would have found had he investigated further). As found by the district court, O'Neal did not carry his burden of demonstrating a reasonable probability that, but for trial counsel's failure to use the DEA Report to spur further investigation, the result of the trial would have been different.

*O'Neal*, 582 F. App'x at 574–75.

In a case much like this one, *Chorazyczewski v. Jackson*, the petitioner—who had been convicted of armed robbery for stealing a TV at Costco—claimed that his trial counsel failed to call a qualified expert witness who, according to the petitioner, had enhanced the surveillance video of his initial confrontation with Costco employees. No. 17-2338, 2018 WL 2144099, at *1, 4 (6th Cir. Mar. 29, 2018). The district court rejected the claim because the petitioner "failed to identify an expert who analyzed and enhanced the surveillance video and who would have testified favorably in his defense with respect to the video." *Id.* at *4. The Sixth Circuit denied a certificate of appealability on this claim because "[r]easonable jurists could not disagree" with the court's decision. *Id.* (citing *Clark v. Waller*, 490 F.3d 551, 557 (6th Cir. 2007) (rejecting petitioner's ineffective-assistance claim arising from counsel's failure to call a particular witness because the petitioner "offered no evidence, beyond his assertions, to prove what the content of [the witness's] testimony would have been")).

Remember, Petitioner bears the burden of showing that his counsel gave ineffective assistance. *United States v. Johnson*, 765 F.3d 644, 648 (6th Cir. 2014); *see Smith v. Rewerts*, No. 19-1421, 2020 WL 1952496, at *2 (6th Cir. Jan. 6, 2020) ("To establish ineffective assistance of counsel, a defendant must show deficient performance and resulting prejudice."). Because Petitioner has presented neither the enhanced video surveillance of the store or the purported expert testimony that he argues would result from its review, he has not met his burden of showing prejudice.

What is more, Petitioner argues only that an expert reviewing the enhanced footage could determine whether Petitioner is the individual depicted—not that the expert could testify that Petitioner was not the individual depicted. "[T]he absence of evidence cannot overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance." *Burt v. Titlow*, 571 U.S. 12, 23 (2013) (internal quotation marks and alterations omitted); s*ee Ferguson v. Tice*, No. 1:18-cv-00388, 2021 WL 288882, at *6–7 (W.D. Pa. Jan. 28, 2021) (denying habeas relief where enhancement of video was impossible and petitioner did not identify an expert willing to attempt to enhance the video and testify).

As stated above, the TCCA identified and applied the correct Supreme Court precedent in *Strickland*. *Winn v. State*, 2017 WL 2211423, at *7–8. And because Petitioner has not proven prejudice, the TCCA's decision is not contrary to and does not unreasonably apply *Strickland*. *See Stewart v. Wolfenbarger*, 468 F.3d 338, 353 (6th Cir. 2006) (rejecting ineffective assistance claim where the petitioner presented no admissible supporting evidence in the state courts). The TCCA did not base its decision on an unreasonable determination of facts given the evidence before the state courts. The Court therefore **DENIES** Petitioner's claim that his counsel gave ineffective assistance by failing to introduce an enhanced surveillance video.

## B.     Height

Petitioner next argues that his trial counsel gave ineffective assistance by failing to present evidence of Petitioner's height to the jury. (ECF No. 1-1 at PageID 55.)

On post-conviction appeal, the TCCA denied relief on this claim, holding:

> The Petitioner asserts that trial counsel's failure to prove the Petitioner's actual height to the jury was deficient. He argues that he was prejudiced by this failure because Mr. Williams testified that the perpetrator was between 5'8" and 5'9", and if the jury had known that the Petitioner was 5'11", it would not have convicted him. The post-conviction court did not make specific findings

regarding this issue, but, as noted above, the post-conviction court concluded that trial counsel's performance was not deficient and denied relief.

We conclude that the Petitioner has failed to establish that he was prejudiced by trial counsel's failure to proffer evidence of the Petitioner's actual height to the jury. As noted above, the State's strongest evidence of the Petitioner's identity was Ms. Jean's identification of the Petitioner. It is unlikely that actual evidence that the Petitioner was a few inches taller than Mr. Williams's description of the perpetrator would have altered the jury's verdict. Because the Petitioner has failed to establish prejudice, we will not address whether trial counsel's performance in this aspect was deficient. *See Finch*, 226 S.W.3d at 316. He is not entitled to relief on this ground.

*Winn v. State*, 2017 WL 2211423, at *8.

Petitioner asserts that the TCCA's decision violated and unreasonably applied *Strickland*. (ECF No. 1-1 at PageID 56.) He asserts that the TCCA's decision was based on an unreasonable determination of facts. (*Id.*) Petitioner argues that the TCCA stated that Williams testified that the perpetrator was between 5'8" and 5'9," when Williams testified that "he estimated the man was 5'8."" (*Id.*) Petitioner contends that, if his counsel had presented evidence that Petitioner was "one inch from being 6' tall," there is a reasonable probability that the jury would have acquitted him. (*Id.*)

Respondent counters that the TCCA's decision did not unreasonably apply *Strickland*. (ECF No. 16 at Page ID 3069.) Respondent emphasizes that the TCCA correctly characterized Williams' trial testimony about the perpetrator's height. Williams testified "I would be guessing at the approximate [height], but I would say, maybe five-eight" or "about five-eight, or five-nine." (*Id.*; *see* ECF No. 14-6 at PageID 805, 822.) Respondent points out that Williams never identified Petitioner as the shooter, and Jean's identification was the strongest evidence against Petitioner. (ECF No. 16 at PageID 3069.) Respondent asserts that a minor discrepancy between Williams' estimate of the perpetrator's height and Petitioner's actual height does not reasonably undermine confidence in the outcome of the trial. (*Id.*)

Williams testified that, when he got to work on the day before the shooting, he saw:

> a guy with a dark sweater, or coat on, and he had the hood up, he had his hands in his pocket and his head down. So when I opened the door, he lift up his head and he had a mask on. And he saw me and he turned around and went back this way.

(ECF No. 14-6 at PageID 804.) The mask was clear plastic and had a smiley face on it. (*Id.* at PageID 805.) The man was black, and around five-eight. (*Id.*) Williams called the police. (*Id.* at PageID 808.)

On the morning of the murder, Williams was working in the deli area. (*Id.* at PageID 810.) He recalled hearing the buzzer on the front door, some conversation, and "then I heard 'Pow'." (*Id.* at PageID 811.) Williams "heard a body drop, weight hitting floor," but he did not know what it was. (*Id.*) He testified:

> And I was like a deer caught in a headlight. You know, I ducked a little bit and when I looked back I could see the upper torso of Zack laying on his back, behind the counter. And I am freaking out right now, . . . .

(*Id.* at PageID 811–12.) Williams tried to hide and slid under the coffee machine. (*Id.* at PageID 812.)

Williams then described the person he saw as having "just dark, dark colored clothing. (*Id.*) Williams said that he was "actually trying to make sure that he didn't see me." (*Id.*) Williams was hiding and "peeking my head up." (*Id.*) He was able to see a mask, "[t]he same mask, the same coat" as the man he had seen the day before. (*Id.* at PageID 813, 817, 829.)

On cross-examination, Petitioner's counsel cross-examined Williams asking what description he gave to police on the day of the shooting, and Williams responded, "I think I said, probably, about five-eight, or five-nine, maybe 170 lbs. I could be mistaken." (*Id.* at PageID 822.) Williams testified that he thought it was the same man because "someone said he had on a shiny mask," but Williams admitted that he did not see the mask until he saw the security video.

(*Id.* at PageID 830–31.)  Williams said that, "[a]t that particular time, I did not see the guy, because I was at my station.  When I did see the guy I saw him from waist down, first.  And then I saw him from waist up, but he had his back turned to me."  (*Id.* at PageID 831.)  Petitioner's counsel established that Williams saw the perpetrator's black jacket, but Williams never saw the front of the individual, could not tell if he had on gloves or a mask, could not tell the color of his shoes or the gun, or if the individual was black or white.  (*Id.*  at PageID 833–34.)

Petitioner's counsel cross-examined Williams thoroughly, emphasizing that he could not identify the perpetrator because he was hiding during the robbery.  And Williams could only identify the dark clothes worn by the perpetrator and admitted that his description of the perpetrator's height was a mere estimate.  As stated above, the prosecution mostly relied on Jean's identification for the conviction.  *See Winn v. State*, 2017 WL 2211423, at *8.

Again, the TCCA identified and applied the correct Supreme Court precedent in *Strickland*.  *Id.* at *7–8.  Given counsel's thorough cross-examination of Williams establishing his inability to identify Petitioner as the perpetrator, Petitioner has not met his burden of proving deficient performance or prejudice.  Because it noted the evidence showed that Williams could only estimate the perpetrator's height and did not get a good look at the perpetrator, and that the prosecution relied mostly on Jean's identification for the conviction, the TCCA's decision does not violate or unreasonably apply *Strickland* and was not based on an unreasonable determination of facts.  The Court therefore **DENIES** Petitioner's claim that his counsel gave ineffective assistance by failing to introduce evidence of his height to the jury.

### C.    Testing Clothing for Victim's Blood

Another claim Petitioner argues is that his counsel gave ineffective assistance by failing to submit Petitioner's clothing to be tested for the victim's blood.  (ECF No. 1-1 at PageID 57.)

On post-conviction appeal, the TCCA denied relief on this claim:

> The Petitioner additionally asserts that trial counsel's failure to submit his clothing to be tested for the presence of the victim's blood was deficient. He argues that he was prejudiced by this failure because the lack of the victim's blood on his clothing would have established that he was not present during the offense. The State argues that because the Petitioner was not identified as a suspect of interest in the case until more than seven weeks after the offense, "[i]t would have been virtually impossible to establish that any clothing offered by the [P]etitioner for analysis at that late stage was the same clothing he wore on the day of the robbery/murder." The post-conviction court found that testing would not have "change[d] anything to put on proof that there [wa]s no blood on his clothes[.]" The post-conviction court also found that it was unclear how the clothes would have been analyzed and whether the trial court would have approved funding for any analysis.
>
> We agree with the post-conviction court that the Petitioner cannot establish that he was prejudiced by trial counsel's failure to submit the Petitioner's clothing for testing for the victim's blood. As we have noted above, the State's strongest evidence against the Petitioner was Ms. Jean's identification; analysis of the Petitioner's clothing would not have contradicted her testimony. Moreover, the Petitioner did not present at the evidentiary hearing the results of any such testing for the post-conviction court to consider. The Petitioner has failed to establish that he was prejudiced by trial counsel's failure to request testing. Because the Petitioner has failed to establish prejudice, we will not address whether trial counsel's performance in this aspect was deficient. *See Finch*, 226 S.W.3d at 316. He is not entitled to relief on this ground.

*Winn v. State*, 2017 WL 2211423, at *9.

Petitioner claims again that the TCCA's decision violates and unreasonably applies

*Strickland*. (ECF No. 1-1 at PageID 58.) He also argues that the TCCA based its decision on an

unreasonable determination of facts because of the post-conviction court's "baseless conclusion"

that testing Petitioner's clothing would not have changed the outcome of his trial. (*Id.*)

Petitioner asserts that, based on Williams' testimony that the perpetrator stepped over the

victim's body to pick up money from the floor, blood should have "transferred to the bottom of

petitioner's shoes and onto the back of the perpetrator's pants leg from impact blood sp[l]atter

. . . as the victim lie in the pool of blood as the victim ble[]d out from gunshot wou[n]d to his left upper eyelid." (*Id.*)  Petitioner contends that, had his trial counsel requested DNA analysis for Petitioner's clothing to test for the victim's blood, there is a reasonable probability that the jury would have acquitted him.  (*Id.*)

On the other hand, Respondent emphasizes the TCCA's observations that any analysis of Petitioner's clothing would not have contradicted Jean's identification and that Petitioner failed to produce the results of any testing of his clothing at the post-conviction hearing.  (ECF No. 16 at PageID 3069–70.)  And so Respondent asserts that the TCCA correctly concluded that Petitioner did not show prejudice.  (*Id.*)  Respondent asserts that the record supports the TCCA's decision, noting that Petitioner was not identified as a suspect until more than seven weeks after the shooting "making it virtually impossible to establish that any clothing offered for testing was the same clothing" worn on the day of the murder.  (*Id.* at PageID 3070.)  Respondent argues that the TCCA's rejection of his claim was not unreasonable.  (*Id.*)

Because Petitioner pleaded not guilty to the crime, it makes little strategic sense to offer up his clothing for testing when he claimed no involvement with the shooting.  Of course, as Respondent points out, a long period passed between the crime and Petitioner's arrest.  This would make it impossible to know whether any clothing related to the crime scene  was authentic and unaltered.  What is more, Petitioner has presented no clothing for testing to prove that the victim's blood was not present.  And so Petitioner has no evidence to show prejudice.  "[T]he absence of evidence cannot overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance."  *Burt*, 571 U.S. at 23 (internal quotation marks and alterations omitted); *see also Rankin v. Palmer*, 626 F. App'x 703, 705–706 (9th Cir. 2015) (noting that the "absence of evidence" where the petitioner had not tested the clothing for

blood and the lack of an exculpatory negative test result "prevents us from determining that Rankin carried his burden as to prejudice").

Petitioner has not met his burden of proving deficient performance or prejudice. The TCCA's decision does not violate or unreasonably apply *Strickland* and was not based on an unreasonable determination of facts given the evidence. The Court therefore **DENIES** Petitioner's claim that his counsel gave ineffective assistance by failing to test his clothing for the victim's blood.

### D.     Impeachment of Informant

Lastly, Petitioner argues that his trial counsel gave ineffective assistance by failing to investigate the State's witness Antonio Johnson for possible impeachment evidence. (ECF No. 1-1 at PageID 59.)

On post-conviction appeal, the TCCA denied this claim, stating:

> The Petitioner asserts that the State had a "deal" with Mr. Johnson to let him out of jail if he testified against the Petitioner. The Petitioner testified at the post-conviction hearing that individuals had informed him that Mr. Johnson said that he lied during the Petitioner's trial so that he would be let out of jail. The post-conviction court found that trial counsel emphasized at trial that Mr. Johnson had served as an informant and witness for the State on a previous murder case.
>
> We conclude that the Petitioner has failed to establish that he was prejudiced by trial counsel's failure to investigate an alleged "deal" between Mr. Johnson and the State in exchange for his testimony. The portions of the trial transcripts included in the record reflect that trial counsel cross-examined Mr. Johnson regarding his previous experience testifying for the State. The Petitioner offered no evidence to support his allegation that the State had a "deal" with the Petitioner besides his own assertion. More specifically, the Petitioner did not present the testimony of the individuals who allegedly heard Mr. Johnson's statement. Thus, the Petitioner cannot establish that he was prejudiced by trial counsel's performance in this regard. *See Black*, 794 S.W.2d at 757. Additionally, the record reflects that trial counsel filed a pretrial motion seeking disclosure of the "existence, substance, and the manner of execution or fulfillment of any promise, statement, agreement, understanding, or arrangement (between the State or its agents and any prosecution witness, cooperating individual, or such person's attorneys or representatives) given for the purpose of obtaining said

> person's testimony, cooperation, or disclosure of information," which the trial court granted. Because the Petitioner has failed to establish prejudice, we will not address whether trial counsel's performance in this aspect was deficient. *See Finch*, 226 S.W.3d at 316. He is not entitled to relief on this ground.

*Winn v. State*, 2017 WL 2211423, at *9.

As with his other claims, Petitioner asserts that the TCCA's decision violated and unreasonably applied *Strickland*. (ECF No. 1-1 at PageID 59, 61.) He also argues that the TCCA based its decision on an unreasonable determination of facts based on the TCCA's acknowledgement that Johnson had served as an informant and witness in a previous murder case. (*Id.* at PageID 61.) Petitioner argues that, if his counsel had been given this information, he had a duty to investigate whether a written conditioned agreement had been made between the State and Johnson in exchange for his testimony against Petitioner. (*Id.*)

According to Petitioner, counsel could have presented such an agreement to impeach Johnson's credibility. (*Id.*) Petitioner asserts that his counsel could have argued that Johnson's capacity was impaired because he had been taking prescription drugs, including drugs for hallucinations, during the relevant period. (*Id.*) And so Petitioner concludes that had his trial counsel conducted appropriate investigations about Johnson, there is a reasonable probability that the jury would have acquitted him. (*Id.* at PageID 61–62.)

Respondent counters that the TCCA's observations that Petitioner's trial counsel cross-examined Johnson about his experience testifying for the State, that Petitioner failed to present evidence that Johnson made a deal in exchange for his testimony, and that the trial court granted Petitioner's pretrial motion seeking disclosure of the "existence, substance, and the manner of execution or fulfillment of any promise, statement, agreement, understanding, or arrangement (between the State or its agents and any prosecution witness, cooperating individual, or such person's attorneys or representatives) given for the purpose of obtaining said person's

58

testimony." (ECF No. 16 at PageID 3070.)  And so Respondent asserts that the TCCA correctly

concluded that Petitioner did not show prejudice. (*Id.*)

Also Respondent asserts that the record supports the TCCA's conclusions and that

Petitioner's arguments are speculative. (*Id.* at PageID 3071.)  Respondent points out that

Johnson testified that the State did not promise him anything. (*Id.*)  Respondent also notes that

Petitioner's trial counsel cross-examined Johnson about his experience testifying as a state's

witness, his motive for testifying against Petitioner, and the medication he was taking. (*Id.*)

Indeed, both Petitioner's counsel and the State addressed Johnson's credibility at trial.

The prosecution set out Johnson's criminal history, including multiple counts of theft and

burglary. (*See* ECF No. 14-8 at PageID 1049–52.)  Johnson testified that the State had not

promised him anything or made any offers for his testimony. (*Id.* at PageID 1065.)  Johnson also

testified that it was his idea to go to the police. (*Id.*)

On cross-examination, Petitioner's counsel emphasized that Johnson had been convicted

of thirteen felonies and was a career offender. (*Id.* at PageID 1066–67.)  Petitioner's counsel

questioned Johnson about his motive in talking to the police:

> Q.   Now, the very next day, on the 13th, they move you up to the fourth floor?
> A.   Yes, sir.
> Q.   And then, when did you contact Sergeant Max asking him to move you back down?
> A.   When I got a chance to use the phone.
> Q.   So the very first thing you do on the phone, or one of the first thing you do when you get a chance to communicate with the outside world, is to call the detective on this case and ask for a favor?
> A.   Yes, sir.
> Q.   And you know you could get that favor, didn't you?
> A.   No, sir.
> Q.   You didn't?
> A.   No, sir.  My life was in jeopardy, in that pod, because he was infuriating me.
> Q.   I'm sorry?

> A.     My life was in jeopardy in that pod, because he was affiliated with the G.D.'s.
> . . .
> Q.     In a case that was pending in '09, you got probation?
> A.     Yes, sir.
> Q.     As a career offender?
> A.     Yes, sir.
> Q.     Right?
> A.     Yes, sir.
> Q.     And that wasn't giving you anything, was it?
> A.     No, sir.

(ECF No. 14-8 at PageID 1069–71.)  On cross-examination, Johnson again stated that he called the police because he wanted to and that getting moved back to the second floor had nothing to do with his decision to take notes about what Petitioner said.  (*Id.* at PageID 1072.)  Johnson denied that Sgt. Max directed him to take notes.  (*Id.* at PageID 1075.)

Petitioner's counsel pointed out that Johnson was on Haldol, Cogenics, Trazadone, and Hydroxidine, a sedative for anxiety and real bad panic attacks.  (*Id.* at PageID 1072–73.) Johnson testified that he took Haldol, an anti-hallucinogenic, "for seeing and hearing things." (*Id.* at PageID 1074.)  Johnson admitted that he testified in a homicide case in 2005 or 2006.  (*Id.* at PageID 1075-76.)  Petitioner's counsel questioned Johnson more:

> Q.     So by the time this came up in '09, you know darn well what was happening, or what could happen if you took information to an officer about a homicide, didn't you?
> A.     I was doing what I felt was right.
> Q.     You were doing what you felt was right to help yourself, is that correct?
> A.     Not to help myself, no, sir.
> Q.     You're a professional thief.  You've spent the majority of your adult life locked up in prison, or in jail, and now all of a sudden in '05, you've had some sort of epiphany and say, now I've got to do the right thing and just help society?
> A.     Yes, sir.
> Q.     And then, between '05 and '09, I guess you were out there helping society too, right?  Right?
> A.     Nope.  But, I know Assaedi, because I stay right by the store.  That was the store that I went to everyday.  Me and my momma, we shopped at that store.

. . .

Q.    The question was, between '05 and '09, you spent your time outside doing the right thing, didn't you?

A.    No, sir.

Q.    You were out going to church and helping old ladies across the street and all that sort of stuff, right?

A.    No, sir.

Q.    You were still committing crimes, weren't you?

A.    Yes, sir.

Q.    Still being a professional thief?

A.    Yes, sir.

Q.    And then soon as you got back in here, you went back and knew how to get out?

A.    No, sir.

(*Id.* at PageID 1076–77.)  Johnson insisted that, although he has not always done the right thing, he was doing what he felt was right.  (*Id.* at PageID 1078.)  On re-direct, Johnson testified that the victim was a friend, that Johnson's family shopped at the store often, and that the victim would allow them to get food when they were "short" on money.  (*Id.* at PageID 1080.)  Johnson said his relationship with the victim compelled him to come forward with the information from Petitioner.  (*Id.* at PageID 1081.)

The record shows that counsel tried to impeach Johnson's credibility using his criminal history, previous testimony in State cases, and alleged attempts to get a deal in exchange for testifying.  Petitioner's counsel gave the jury reason to question whether Johnson had an ulterior motive in testifying or was seeking a deal in exchange for his testimony.  But Johnson revealed that he knew the victim and therefore felt compelled to testify.

What is more Petitioner has presented no evidence of Johnson telling others he falsely testified at Petitioner's trial to get out of jail or of a deal between Johnson and the State in exchange for his testimony.  *See Winn v. State*, 2017 WL 2211423, at *9.  "[T]he absence of evidence cannot overcome the strong presumption that counsel's conduct fell within the wide

range of reasonable professional assistance." *Burt*, 571 U.S. at 23 (internal quotation marks and alterations omitted).

Petitioner has not met his burden of proving deficient performance or prejudice. The TCCA's decision does not violate or unreasonably apply *Strickland* and was not based on an unreasonable determination of facts because of the evidence presented in the state courts. The Court therefore **DENIES** Petitioner's claim that his counsel gave ineffective assistance by failing to obtain impeachment information related to Johnson.

The Court therefore **DISMISSES** the § 2254 Petition **WITH PREJUDICE**. The Court will enter judgment for Respondent.

## APPELLATE ISSUES

A petitioner is not always entitled to appeal a district court's denial of a § 2254 petition. *Miller-El v. Cockrell*, 537 U.S. 322, 335 (2003). In fact, the Court has to issue or deny a certificate of appealability ("COA") when it enters a final order adverse to a § 2254 petitioner. Rule 11, Rules Governing Section 2254 Cases in the United States District Courts. A petitioner may not take an appeal unless a circuit or district judge issues a COA. 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1). The court may issue a COA only if the petitioner has made a substantial showing of the denial of a constitutional right, and the court has to reflect on the COA the specific issue or issues that satisfy the required showing. 28 U.S.C. §§ 2253(c)(2)–(3). A petitioner makes a "substantial showing" when "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-El*, 537 U.S. at 336 (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)); *Henley v. Bell*, 308 F. App'x 989, 990 (6th Cir. 2009) (per curiam) (holding a prisoner must show that reasonable jurists could

disagree with the district court's resolution of his constitutional claims or that the issues presented warrant encouragement to proceed further).

That said, the petitioner need not show that the appeal will succeed. *Miller-El*, 537 U.S. at 337; *Caldwell v. Lewis*, 414 F. App'x 809, 814–15 (6th Cir. 2011) (same). But courts should not issue a COA as a matter of course. *Bradley v. Birkett*, 156 F. App'x 771, 773 (6th Cir. 2005) (quoting *Slack*, 537 U.S. at 337).

Petitioner's claims here lack merit and are barred by procedural default. Because any appeal by Petitioner on the issues raised in this petition does not deserve attention, the Court **DENIES** a certificate of appealability.

For the same reasons the Court denies a certificate of appealability, the Court finds that any appeal would not be taken in good faith. Thus, the Court **CERTIFIES** under Federal Rule of Appellate Procedure 24(a) that any appeal here would not be taken in good faith, and also **DENIES** leave to appeal in forma pauperis.[6]

**IT IS SO ORDERED**, this 30th day of September, 2021.


s/Thomas L. Parker
THOMAS L. PARKER
UNITED STATES DISTRICT JUDGE

---

[6] If Petitioner files a notice of appeal, he must pay the full $505 appellate filing fee or move to proceed in forma pauperis and file a supporting affidavit in the Sixth Circuit within thirty days from the date of entry of this order. *See* Fed. R. App. P. 24(a)(5).